# EXHIBIT A

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

CASE NO. 2022010714
CASE NO. 2022010599

IN THE CONSOLIDATED MATTERS INVOLVING

PARENT ON BEHALF OF STUDENT, AND

ETIWANDA SCHOOL DISTRICT.

# DECISION

May 27, 2022

On January 21, 2022, the Office of Administrative Hearings, called OAH, received a due process hearing request from Etiwanda School District naming Student as respondent. On January 24, 2022, OAH received a due process hearing request from Student, naming Etiwanda as respondent. On January 31, 2022, OAH granted Student's motion to consolidate the two complaints, deeming Student's complaint as the primary case. On February 4, 2022, OAH granted Student's motion to amend Student's complaint. On March 16, 2022, OAH granted Etiwanda's request to continue hearing to March 29, 2022. Administrative Law Judge Claire Yazigi heard this matter by videoconference on March 29 and 30, and April 1, 5, 6, 7, and 8, 2022.

1

Sheila Bayne, Robert Burgermeister, Lynda Williams, and Constance Zarkowski, attorneys at law, represented Student.  Parent attended portions of the hearing on Student's behalf.  Sundee Johnson, attorney at law, represented Etiwanda.  Elizabeth Freer, Etiwanda's special education director, attended all hearing days on Etiwanda's behalf.  Dr. Royal Lord attended hearing on behalf of the West End SELPA.

The matter was continued to May 2, 2022 for written closing briefs.  The record was closed, and the matter was submitted on May 2, 2022.

## ISSUES

The ALJ reviewed and confirmed the issues in the March 16, 2022 Order Following Prehearing Conference with the parties on the first day of hearing.  A free appropriate public education is referred to as a FAPE, and an individualized educational program is referred to as an IEP.

### STUDENT'S ISSUES

1. Did Etiwanda deny Student a FAPE by failing to conduct an appropriate psychoeducational assessment dated May 17, 2021?

2. Did Etiwanda deny Student a FAPE by failing to conduct a functional behavior analysis of Student prior to the December 8, 2021 IEP team meeting?

3. Did Etiwanda's December 8, 2021 IEP deny Student a FAPE by failing to offer Student:

    a. Appropriate goals in the areas of:

        i. Listening comprehension;

        ii. Vocabulary;

        iii. Sorting;

        iv. One-to-one correspondence;

    v.  Personal information;

    vi.  Functional equivalent replacement behavior;

    vii.  General positive behavior;

    viii.  Pragmatics and social skills;

b.  A behavior intervention plan;

c.  Appropriate services to address Student's auditory processing sensory deficits;

d.  A one-to-one aide for the entire school day, and during Student's round trip bus transportation to school;

e.  Placement in a general education classroom for 50 percent of Student's school day;

f.  Home applied behavior analysis therapy and clinic meetings;

g.  Parent training for addressing Student's behavioral issues;

h.  Equestrian therapy;

i.  Appropriate speech and language services;

j.  Appropriate occupational therapy;

k.  An independent educational evaluation of Student's need for physical therapy and agreement to fund physical therapy by a non-public agency based on the independent evaluator's recommendation;

l.  Behavior counseling; and

m.  Tutoring by a non-public agency?

4. Did Etiwanda prevent Parent from meaningfully participating in the development of Student's IEP by holding Student's December 8, 2021 IEP team meeting without Parent?

3

ETIWANDA'S ISSUE

5.  Did Etiwanda's December 8, 2021 IEP offer Student a FAPE such that Etiwanda
    can implement the December 8, 2021 IEP without Parents' consent?

Student withdrew issues 1 and 2 in Student's closing brief.  Issues 1 and 2 are
therefore dismissed with prejudice.

JURISDICTION

This hearing was held under the Individuals with Disabilities Education Act, its
regulations, and California statutes and regulations.  (20 U.S.C. § 1400 et. seq.; 34 C.F.R.
§ 300.1 (2006) et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.)
The main purposes of the Individuals with Disabilities Education Act, referred to as the
IDEA, are to ensure:

- all children with disabilities have available to them a FAPE that emphasizes special
  education and related services designed to meet their unique needs and prepare
  them for further education, employment and independent living, and
- the rights of children with disabilities and their parents are protected.  (20 U.S.C.
  § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

The IDEA affords parents and local educational agencies the procedural
protection of an impartial due process hearing with respect to any matter relating to the
identification, assessment, or educational placement of the child, or the provision of a
FAPE to the child.  (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501,
56502, and 56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is
limited to the issues alleged in the complaint, unless the other party consents, and has
the burden of proof by a preponderance of the evidence.  (20 U.S.C. § 1415(f)(3)(B); Ed.

Code, § 56502, subd. (i); *Schaffer v. Weast* (2005) 546 U.S. 49, 57-58, 62 [126 S.Ct. 528, 163 L.Ed.2d 387]; and see 20 U.S.C. § 1415(i)(2)(C)(iii).)  Student had the burden of proof as to Student's issues, and Etiwanda had the burden of proof as to Etiwanda's issue.  The factual statements in this Decision constitute the written findings of fact required by the IDEA and state law.  (20 U.S.C. § 1415(h)(4); Ed. Code, § 56505, subd. (e)(5).)

At the time of hearing, Student was 12 years old and in the sixth grade.  Student resided within Etiwanda's geographic boundaries at all relevant times.  Student was eligible for special education under the primary category of Multiple Disabilities based on Student's eligibility under Intellectual Disability, Other Health Impairment, and Speech or Language Impairment.

## ISSUE 5: DID ETIWANDA'S DECEMBER 8, 2021 IEP OFFER STUDENT A FAPE SUCH THAT ETIWANDA CAN IMPLEMENT THE DECEMBER 8, 2021 IEP WITHOUT PARENTS' CONSENT?

Etiwanda contends that its December 8, 2021 IEP offered Student a FAPE such that it can implement the December 8, 2021 IEP without Parent's consent.  Student contends that the December 8, 2021 did not offer Student a FAPE and Etiwanda may not implement it without Parent's consent.  Further, Student contends that Etiwanda's development of the December 8, 2021 IEP without Parent's attendance at the IEP team meeting was a fatal, substantive flaw that deprived Student of a FAPE.

A FAPE means special education and related services that are available to an eligible child that meets state educational standards at no charge to the parent or guardian.  (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.)  Parents and school personnel develop an individualized education program, referred to as an IEP, for an eligible student based upon state law and the IDEA.  (20 U.S.C. §§ 1401(14), 1414(d)(1); and see

Ed. Code, §§ 56031,56032, 56341, 56345, subd. (a) and 56363 subd. (a); 34 C.F.R. §§ 300.320, 300.321, and 300.501.)

The IEP is the centerpiece of the IDEA's education delivery system for disabled children and consists of a detailed written statement that must be developed, reviewed, and revised for each child with a disability. (*Honig v. Doe* (1988) 484 U.S. 305, 311 [108 S.Ct. 592, 98 L.Ed.2d 686]; 20 U.S.C. §§ 1401(14), 1414(d)(1)(A); Ed. Code, §§ 56032, 56345.) The IEP is the "modus operandi" of the IDEA, that contains a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs. (*School Comm. of Town of Burlington, Mass. v. Department of Educ. of Mass.* (1985) 471 U.S. 359, 368 [105 S.Ct. 1996].)

An IEP is a written document for each child with a disability that includes a statement of the child's present levels of academic achievement and functional performance, including how the child's disability affects the child's involvement and progress in the general education curriculum. (20 U.S.C. § 1414(d)(1)(A)(i)(I); 34 C.F.R. § 300.320(a)1); Ed. Code, § 56345, subd. (a)(1).) In developing the IEP, the IEP team must consider the strengths of the child, the concerns of the parents for enhancing the child's education, the result of the most recent evaluation of the child, and the academic, developmental, and functional needs of the child. (20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. §§ 300.324 (a).) Information about a child's present levels may derive from a variety of sources, including IEP team members, assessment reports, work samples, and grades. (See, *J.L.N. v. Grossmont Union High School* (S.D. Cal., Sept. 30, 2019, No. 17-CV-2097-L-MDD) 2019 WL 4849172, at p. 8.)

Etiwanda had the burden of proving in Issue 5 that the December 8, 2021 IEP offered Student a FAPE by establishing it was both procedurally and substantively

appropriate.  Etiwanda did not meet its burden of proof on this issue.  In general, a child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.  (*Board of Education of the Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201-204 (*Rowley*); *Endrew F. v. Douglas County School Dist. RE-1* (2017) 580 U.S. ___ [137 S.Ct. 988, 1000] (*Endrew F.*).)  Here, Etiwanda's December 8, 2021 IEP did not offer student a FAPE because the IEP team failed to offer a goal to address Student's intelligibility and sound production need.  The IEP team also failed to offer a measurable vocabulary development goal, or any occupational therapy goal in praxis/motor planning or social participation.  As discussed more fully below, these omissions rendered the IEP substantively deficient because it did not meet Student's disability related needs. A student's educational program consists of all the components of the offered IEP, not of only one component; when one component is removed, FAPE does not exist.  Accordingly, it is unnecessary to reach the question of procedural compliance, including proceeding with an IEP team meeting without Parent present, and the other substantive components of the offer.

## STUDENT'S NEEDS

Student was a friendly and social 12-year-old boy who enjoyed greeting general education and special education peers alike.  Because Student came to live with Parent as a foster child at two years of age, the nature of Student's disabilities was unclear.  Student had significant cognitive, social, and behavioral needs, and functionally operated at the level of a toddler.  Student was largely non-verbal, making, at most, two or three word approximations and could not read or write.

In May 2021, Etiwanda completed Student's triennial assessments in the areas of psychoeducation, speech and language, occupational therapy, physical education, health, academics, and a functional behavior analysis. Etiwanda established that each of the assessors were qualified to conduct the assessments in the areas in which they assessed Student. The IEP team reviewed and considered the results of the triennial assessments on December 8, 2021 and determined that Student had needs in the areas of reading, writing, math, behavior, and the communication areas of receptive/expressive language, intelligibility/sound production, and pragmatics. The IEP team offered Student goals to address all stated areas of need, except for intelligibility and sound production. The IEP team offered a vocabulary development goal that was not measurable. The Etiwanda members of Student's IEP team incorrectly determined that praxis/motor planning or social participation were not areas of need for Student and did not offer goals in these areas. The evidence at hearing, including Etiwanda's occupational therapy assessment of Student, established they were areas of definite dysfunction.

## THE DECEMBER 8, 2021, IEP DID NOT ADDRESS STUDENT'S INTELLIGIBILITY AND SOUND PRODUCTION NEED

Etiwanda offered an intelligibility/sound production goal in Student's July 2020 IEP. The goal specified that Student would produce t, d, w, f, y in consonant-vowel and consonant-vowel-consonant-vowel combinations. Student did not participate in distance learning or services during the 2020 COVID school closures, so the December 8, -2021 IEP team could only consider Student's progress on this goal for the period between March 15, 2021, when Student returned to in-person speech and language services, to the time of the speech language assessment of May 2021. Student had not met the intelligibility goal by the time of the May 2021 assessment and

continued to substitute "d" for a variety of initial consonant sounds.  Student correctly pronounced targeted sounds in 30 percent of words.  Student's intelligibility at the single word level at 30 percent affected Student's ability to communicate in an effective manner using words only.

Cathy Wilkerson, speech and language pathologist for Etiwanda, provided speech and language services to Student and conducted the speech and language assessment in April 2021.  Wilkerson testified at hearing.  Wilkerson's testimony was clear, detailed, and exhibited a thorough knowledge of Student in the speech and language context, and was credible.  Wilkerson concluded in her May 11, 2021, report that: Student continued to meet eligibility criteria for a speech/language disorder in the area of, among other things, articulation; Student's language skills were at a three-year-old level; and that Student's speech/language disorder was severe.

Wilkerson opined that Student's oral motor delay disorder impacted Student's ability to make targeted sounds.  Student had difficulty making non-sound producing motions with his mouth, like moving his tongue from left to right, and licking his lips.  Student could not hold his lips closed for more than one second, and could not click his tongue.  Student could make two or three-word utterances, but most of the words were approximations.  Student also had a habit of pulling his lower lip over his lower teeth, which made bilabial sounds like p and b difficult.  Student also frequently made "taco tongue" which made oral motor activities difficult.

Wilkerson administered the Articulation/Phonology Scale portion of the Communication Severity Scales.  Wilkerson concluded that most of Student's phoneme and/or phonological process errors were not stimulable for correct production.  But Wilkerson did not opine that this meant that further intelligibility and sound production work was futile.  Rather, the December 8, 2021 IEP team found that intelligibility and

sound production were areas of Student's need.  The IEP team concluded that, for Student to receive educational benefit, goals would be written to address, among other areas, intelligibility and sound production.

The December 8, 2021, IEP did not, however, offer a goal in intelligibility and sound production.  The December 8, 2021, IEP included a progress report on the July 2020 intelligibility goal, stating that Student had not made progress on the goal due to Student's lack of participation in distance learning.  Wilkerson also credibly testified that she was trained to facilitate articulation by using tactile cues (placing her hands on a student's mouth) to improve production of sounds, but Student did not like to be touched.  But no witness at hearing credibly testified that the December 8, 2021 IEP team concluded Student could no longer benefit from work on an intelligibility goal, or gave explanation as to why an intelligibility goal was not included.  Etiwanda failed to offer a necessary goal to address Student's need in intelligibility and sound production, rendering the IEP insufficient to constitute a FAPE or to implement without parental consent.

## STUDENT'S VOCABULARY DEVELOPMENT GOAL WAS NOT MEASURABLE

The IEP must include a statement of measurable annual goals, including academic and functional goals, designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum, and meet each of the child's other educational needs that result from the child's disability.  (20 U.S.C. § 1414(d)(1)(A)(i)(II); 34 C.F.R. § 300.320(a)(2); Ed. Code, § 56345, subd. (a)(2).)  In addition, the IEP must contain statements of how the child's goals will be measured and the special education and related services, based on peer-reviewed research to the extent practicable, that will be provided to the student.

(20 U.S.C. §1414(d)(1)(A)(i)(III), (IV); 34 C.F.R. § 300.320(a)(3), (4); Ed. Code, § 56345, subd. (a)(3), (4).)

IEP Goal 9 addressed vocabulary development.  The goal stated that Student would identify, sort and label at least 24 items/pictures into categories "with verbal approximation, sign, speech generating device."  Student was to do so with 70 percent accuracy over four consecutive sessions with no more than two additional verbal or visual cues.  The goal did not specify whether this goal would be met if Student used any of the methods to sort a total of 24 items/pictures, or whether Student was expected to sort 24 items/pictures by verbal approximation, 24 items/pictures by sign, and 24 items/pictures by speech generating device.  The goal was not specific as to how it would be measured, and thus was not legally compliant.  The non-compliant goal rendered the IEP defective such that the IEP did not constitute FAPE and Etiwanda could not implement the IEP without parental consent.

## THE DECEMBER 8, 2021, IEP DID NOT ADDRESS STUDENT'S NEEDS IN PRAXIS/MOTOR PLANNING AND SOCIAL PARTICIPATION

Etiwanda failed to identify praxis/motor planning and social participation as areas of Student's need, and to provide corresponding goals in those areas.  Nothing in the IDEA requires that children be classified by their disability so long the child has an eligible disability under the IDEA and by reason of that disability needs special education and related services.  (20 U.S.C. § 1412(a)(3)(B).)  A properly crafted IEP addresses a student's individual needs regardless of the student's eligibility category. (See *Fort Osage R-1 School Dist. v. Sims* (8th Cir. 2011) 641 F.3d 996, 1004 [category "substantively immaterial" (*Osage*)]; *Hailey M. v. Matayoshi* (D. Hawaii, Sept. 7, 2011, No. 10-00733) 2011 WL 3957206, p. 3 (*Hailey M.*).)  The purpose of categorizing disabled students is to try to meet their educational needs and is not an end to itself.  (*Pohorecki*

*v. Anthony Wayne Local School Dist.*, 637 F.Supp.2d 547, 557 (N.D. Ohio 2009).)  See *Heather S. v. Wisconsin*, 125 F.3d 1045, 1055 (7th Cir.1997) (noting whether the student was described as cognitively disabled, other health impaired, or learning disabled was immaterial.  The IDEA concerned itself not with labels, but with whether a student was receiving a free and appropriate education.)

Etiwanda occupational therapist Will Hardy provided Student occupational therapy services from March 2020 until February of 2022.  Hardy also conducted Etiwanda's April 2021 occupational therapy assessment of Student and testified at hearing.  Hardy's testimony was credible based on his education, qualifications, experience as an occupational therapist, and his experience conducting occupational therapy assessments.  Student did not challenge the appropriateness of Hardy's assessment.

Hardy concluded in his report that Student had school-based occupational therapy needs in fine motor and pre-writing skills.  As a result, the IEP team offered Student a goal in this area.

Hardy also found that Student exhibited "definite dysfunction" in praxis/motor planning and social participation.  Hardy defined praxis in his report as the ability to use one's hands and body to perform a skilled task.  Hardy opined that new activities require more praxis than routine activities.  Praxis assists a child in mastering repeated tasks so that they become routine, habitual tasks.  Hardy explained motor planning as adjusting the plan and grading, sequencing, and timing of body movements.

Hardy did not identify praxis/motor planning or social participation as areas of Student's need, however, because Student's dysfunctions in praxis/motor planning and

social participation were not due to any sensory processing impairment.  As a result, the IEP team did not offer Student goals in those areas.

JanDee Goodiss testified on behalf of Student.  At the time of hearing, Goodiss had worked as an occupational therapist for over forty years.  At all times during her career, Goodiss provided pediatric occupational therapy to children.  From 2005 to 2011, Goodiss worked for another California school district as an occupational therapist, providing occupational therapy to students, performing assessments, attending IEP team meetings, and providing training to teachers.  Goodiss did not assess nor provide occupational therapy services to Student.  In preparation for hearing, Goodiss observed Student via a 15-minute video call two nights before her testimony and conducted a records review of Hardy's assessment report and the December 8, 2021 IEP.  While Goodiss had not worked with or assessed Student and was unfamiliar with Student's school, Goodiss testified in a straightforward and thoughtful manner, and was credible based on her decades-long experience as a pediatric occupational therapist.

Goodiss asserted that Etiwanda should have included a motor planning goal for Student.  Goodiss reviewed the results of the Sensory Processing Measure administered by Hardy, which was meant to determine whether sensory systems influence praxis/motor planning and social participation.  Goodiss supported her opinion by pointing out that, in completing the Sensory Processing Measure, both Parent and Melvin DelRosario, Student's teacher at the time of assessment, agreed that Student had difficulty with motor planning.  Goodiss also pointed out that Hardy, too, observed poor motor planning in his clinical observation of Student, and yet the December 8, 2021, IEP included no goal for praxis/motor planning.

The same may be said about Student's dysfunction in social participation: Hardy found that social participation was also an area of definite dysfunction for Student.  Yet

13

the IEP team did not include a goal to address this need.  Student exhibited "definite dysfunction" in praxis/motor planning and a properly crafted IEP would have addressed these needs, regardless of whether the impairments were due to poor sensory processing.  (A properly crafted IEP addresses a student's individual needs regardless of the student's eligibility category (*Osage,* at p. 1004; *Hailey M.* at p. 3).)

While Hardy's testimony was credible, Hardy's conclusion that Student's occupational therapy need was limited to fine visual and motor skills and did not include praxis/motor planning or social participation, was not supported by the evidence. Etiwanda failed to offer Student a FAPE by failing to address Student's areas of need in praxis/motor planning and social participation and provide corresponding goals in those areas.  Etiwanda may not implement the December 8, 2021, IEP without parental consent.

ISSUE 3.A.: DID ETIWANDA'S DECEMBER 8, 2021, IEP DENY STUDENT A FAPE BY FAILING TO OFFER STUDENT APPROPRIATE GOALS IN THE AREAS OF LISTENING COMPREHENSION, VOCABULARY, SORTING, ONE-TO-ONE CORRESPONDENCE, PERSONAL INFORMATION, FUNCTIONAL EQUIVALENT REPLACEMENT BEHAVIOR, GENERAL POSITIVE BEHAVIOR, AND PRAGMATICS AND SOCIAL SKILLS?

The December 8, 2021 IEP offered Student 12 goals.  Student contends that the first eight goals were not appropriate.  Etiwanda contends that all of the goals were legally compliant.

The IEP for each child with a disability must include a statement of measurable annual goals.  The statement of goals must include benchmarks or short-term objectives

related to meeting the child's needs that result from the child's disability.  The annual goals must be designed to enable the child to be involved in and progress in the general curriculum, and to meet each of the child's other educational needs that result from the child's disability. (34 C.F.R. §300.320(b).)  The IEP for each child with a disability must include a statement of how the child's progress toward the child's annual goals will be measured. (34 C.F.R. § 300.320(b)(4).)

The IEP must include appropriate objective criteria, evaluation procedures, and schedules for determining, on at least an annual basis, whether the annual goals are being achieved, and a statement of how the student's progress toward the goals will be measured. (*Jessica E. v. Compton Unified School Dist.* (C.D. Cal. 2017, No. CV16-04356-BRO) 2017 WL 2864945; 20 U.S.C. § 1414(d)(1)A)(i); see also Ed. Code, § 56345.)  An examination of the goals in an IEP is central to the determination of whether a student received a FAPE.  IEP goals and goal achieving methods are considered as of the time the plan was implemented.  The examination of those goals asks whether those methods were "reasonably calculated" to confer a meaningful benefit. (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149 (*Adams*).)

The purpose of annual goals is to permit the IEP team to determine whether the student is making progress in an area of need.  (Ed. Code, § 56345, subd. (a).)  For each area in which a special education student has an identified need, the IEP team must develop measurable annual goals that are based upon the child's present levels of academic achievement and functional performance, and which the child has a reasonable chance of attaining within a year.  (Ed. Code, § 56345; *Letter to Butler* (OSERS 1988) 213 IDELR 118.)

The IEP team need not draft IEP goals in a manner that the parents find optimal, if the goals are objectively measurable. (*Bridges v. Spartanburg County School Dist. Two*

15

(D.S.C. 2011, No. 7:10-cv-01873-JMC) 57 IDELR 128.).  The IEP must contain a description of how the child's progress toward meeting the annual goals described will be measured and when periodic reports on the progress the child is making toward meeting the annual goals, such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards, will be provided.  (20 U.S.C.A. § 1414(d)(1)(A)(iii).)

The goals in listening comprehension, vocabulary, sorting, one-to-one correspondence, personal information, functional equivalent replacement behavior, general positive behavior, pragmatics, and social skills were measurable and identified the individual responsible for measuring progress on each goal, how Student's progress toward meeting the annual goals would be measured, and when progress on short-term objectives would be measured.  Student offered no qualified expert opinion or other evidence that the goals were not measurable, or that the goals did not identify how or when progress would be measured and by whom.  Student did not establish that Etiwanda offered inappropriate goals in the areas of listening comprehension, vocabulary, sorting, one-to-one correspondence, personal information, functional equivalent replacement behavior, general positive behavior, and pragmatics and social skills.

## ISSUE 3.B.: DID ETIWANDA'S DECEMBER 8, 2021, IEP DENY STUDENT A FAPE BY FAILING TO OFFER STUDENT A BEHAVIOR INTERVENTION PLAN?

Student contends that Etiwanda denied Student a FAPE by not offering a behavior intervention plan.  Etiwanda contends that it did, in fact, offer a behavior intervention plan.

A behavior intervention plan was attached to the December 8, 2021, IEP.  Student did not challenge the substantive appropriateness of the behavior intervention plan, merely that one was needed and not offered.  This Decision makes no findings regarding the appropriateness of the behavior intervention plan.  The evidence established a behavior intervention plan was offered.  Student failed to prove that Etiwanda denied Student a FAPE by failing to offer a behavior intervention plan in the December 8, 2021, IEP.

ISSUES 3.C., 3.F., 3.G., 3.H., 3.L., AND 3.M.: DID ETIWANDA'S DECEMBER 8, 2021, IEP DENY STUDENT A FAPE BY FAILING TO OFFER STUDENT SERVICES TO ADDRESS AUDITORY PROCESSING, HOME APPLIED BEHAVIOR ANAYLSIS THERAPY AND CLINIC MEETINGS, PARENT TRAINING, EQUESTRIAN THERAPY, BEHAVIOR COUNSELING, AND TUTORING BY AN NON-PUBLIC AGENCY?

Student's complaint alleges that Etiwanda denied Student a FAPE by failing to offer various services, specifically services to address Student's auditory processing sensory deficits, home applied behavior analysis therapy and clinic meetings, parent training for addressing Student's behavioral issues, equestrian therapy, behavior counseling, and tutoring by a non-public agency.

However, Student did not offer any documentary evidence or witness testimony that supported any one of these six claims.  Student did not meet Student's burden of proof that Etiwanda denied Student a FAPE by failing to offer services to address auditory processing, home applied behavior analysis therapy and clinic meetings, parent training, equestrian therapy, behavior counseling, and or tutoring by a non-public agency.

ISSUE 3.D.: DID ETIWANDA'S DECEMBER 8, 2021, IEP DENY STUDENT A FAPE BY FAILING TO OFFER STUDENT A ONE-TO-ONE AIDE FOR THE ENTIRE SCHOOL DAY, AND DURING STUDENT'S ROUND TRIP BUS TRANSPORTATION TO SCHOOL?

Student contends that Etiwanda's December 8, 2021 IEP offer denied Student a FAPE by failing to offer a one-to-one aide during bus transportation to and from school. Etiwanda contends that Student did not need a one-to-one aide during bus transportation.

Neither party disputes Student's need for a one-to-one aide throughout the school day, nor Student's need for transportation to and from school. Etiwanda offered both in the December 8, 2021, IEP.

In general, a child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. (*Rowley, supra,* 458 U.S. at pp. 201-204; *Endrew F., supra,* 580 U.S. ___ [137 S.Ct. 988, 1000].)  The "educational benefit" to be provided to a child requiring special education is not limited to addressing the child's academic needs, but also social and emotional needs that affect academic progress, school behavior, and socialization. (*County of San Diego v. California Special Educ. Hearing Office* (9th Cir. 1996) 93 F.3d 1458, 1467.)

California law defines special education as instruction designed to meet the unique needs of the pupil coupled with related services as needed to enable the pupil to benefit from instruction. (Ed. Code, § 56031.)  Related services include transportation and other developmental, corrective and supportive services as may be required to

assist the child in benefiting from special education.  (20 U.S.C. § 1401.)  In California, related services are called designated instruction and services, and must be provided as needed to assist an individual with exceptional needs to benefit from special education. (Ed. Code, § 56363, subd. (a).)  An aide may be a required supportive service if one is required to assist a child with a disability to benefit from special education.  (34 C.F.R. § 300.34(a) (2006); Ed. Code, § 56363, subd. (a)s.)

Physical therapist Sloane Allen conducted Etiwanda's physical therapy assessment of Student and testified at hearing.  Allen's testimony was credible based on Allen's education, qualifications, experience as a physical therapist, and experience performing physical therapy assessments.  Allen testified in a direct, clear, and thoughtful manner. Allen spoke with Student's bus driver as part of the assessment.  Allen determined that no environmental or physical barrier existed that would prevent Student form accessing his education.

Elaine Sun, Board Certified Behavior Analyst, conducted the May 6, 2021, functional behavioral analysis.  Sun's analysis resulted in a behavior intervention plan that Sun included in the December 8, 2021 IEP.  Sun testified at hearing in a clear, thorough, and thoughtful manner.  Sun's testimony was credible based on Sun's education, qualifications, and experience as a board-certified behavior analyst.  Sun spoke with the bus driver as part of the functional behavior analysis and concluded that no concern existed regarding Student's ability to ride the bus safely.  The IEP team reviewed Sun's report when developing the IEP.  On one occasion, Student had difficulty getting off the bus, and staff was able to assist Student during dismount.  Student did not, however, present any credible evidence including any expert opinions to establish a need for a one-to-one aide during bus transit.

An IEP is evaluated in light of information available to the IEP team at the time it was developed; it is not judged in hindsight. (*Adams*, at p. 1149.) "An IEP is a snapshot, not a retrospective." (*Id.* at p. 1149, citing *Fuhrmann v. East Hanover Bd. of Education* (3rd Cir. 1993) 993 F.2d 1031, 1041.) It must be evaluated in terms of what was objectively reasonable when the IEP was developed. (*Ibid.*) The snapshot includes vital documentation provided to the district before the IEP's implementation. *Marc M. ex rel. Aidan M. v. Department of Educ., Hawaii* (D. Hawaii 2011) 762 F.Supp.2d 1235, 1243.)

At hearing, Parent testified that Student removed his shoes and socks during transportation, causing the bus driver to stop. Student's closing brief described this behavior as "well documented." However, Student did not establish through any credible evidence that Etiwanda was aware of this behavior at the time the IEP team developed and offered the December 8, 2021, IEP, or that such behavior affected Student's ability to ride the bus safely without a one-to-one aide. Student did not meet his burden that Etiwanda denied Student a FAPE by failing to offer a one-to-one aide during bus transportation to and from school at the time the IEP was drafted or anytime thereafter at issue in this case.

## ISSUE 3.E.: DID ETIWANDA'S DECEMBER 8, 2021, IEP DENY STUDENT A FAPE BY FAILING TO OFFER STUDENT PLACEMENT IN A GENERAL EDUCATION CLASSROOM FOR 50 PERCENT OF STUDENT'S SCHOOL DAY?

Student contends that Etiwanda denied Student a FAPE by failing to place Student in a general education classroom for 50 percent of Student's school day, rather than only 31 percent. Students contends that this could have been achieved by pairing Student with a one-to-one aide in some general education academic classes with modified curriculum. Etiwanda contends that it did not deny Student a FAPE regarding

placement, as its offer appropriately addressed Student's needs, and any increase in general education would not be appropriate given Student's profound needs.

In California, a specific educational placement is defined as the unique combination of facilities, personnel, location or equipment necessary to provide instructional services to a special education student as specified in the student's IEP. (Cal. Code Regs. tit. 5, § 3042. subd. (a).)  In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program.  (See *Gregory K. v. Longview School District* (9th Cir. 1987) 811 F.2d 1307, 1314.)  A school district is not required to place a student in a program preferred by a parent, even if that program will result in greater educational benefit to the student.  (*Ibid.*)

The December 8, 2021 IEP offered Student a two-tiered placement: the first offer of placement was for the remainder of the 2021-2022 school year in the sixth grade in elementary school, when Student would spend 69 percent of school time in special education and 31 percent of time in general education, extracurricular and non-academic activities.  The IEP did not specify how Student would spend 31 percent of time in general education.  However, Assistant Principal Twyla Bowman established that a 31 percent general education placement meant that a student would integrate into the general education setting for things like lunch, recess, PE, as well as any school assemblies.  Bowman also explained that this time could also be used for art and music, but that those subjects were not required.

The second placement offer was for when Student would begin junior high school in the fall of 2022, when Student would spend 66 percent of school time in special education and 34 percent of time in general education, extracurricular and non-academic activities.  The difference in percentages between the elementary and junior

high placement offers was due to the different schedule format in junior high school where Student would be transitioning through several class periods a day.

If a district determines that a child cannot be educated in a general education environment, then the least restrictive environment analysis requires determining whether the child has been mainstreamed to the maximum extent that is appropriate in light of the continuum of program options. (*Daniel R.R. v. State Board of Ed.* (5th Cir. 1989) 874 F.2d 1036, 1050.)  The continuum of program options includes, but is not limited to: regular education; resource specialist programs; designated instruction and services; special classes; nonpublic, nonsectarian schools; state special schools; specially designed instruction in settings other than classrooms; itinerant instruction in settings other than classrooms; and instruction using telecommunication instruction in the home or instructions in hospitals or institutions.  (Ed. Code, § 56361.)

In making its placement offer, the IEP team considered other placement options, specifically, general education, general education with supplemental aids and services, general education with consult and/or collaboration with special education staff, general education class with push-in or inclusion specialized academic instruction in class, as well as pull out options. Ultimately, the Etiwanda members of Student's IEP team determined that because Student required extensive, repeated individualized instruction that was not of a transient or temporary nature, placement in a moderate to severe special day class was most appropriate, with general education inclusion in non-academic areas.

School districts are required to provide each special education student with a program in the least restrictive environment.  To provide the least restrictive environment, school districts must ensure, to the maximum extent appropriate: 1) that children with disabilities are educated with non-disabled peers; and 2) that special

classes or separate schooling occur only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.  (20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. 300.114 (a)(2006); Ed. Code, § 56031.)  To determine whether a special education student could be satisfactorily educated in a regular education environment, the Ninth Circuit Court of Appeals instructs that the following factors be balanced: (1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect the student has on the teacher and children in the regular class; and (4) the costs of mainstreaming the student.  (*Sacramento City Unified School Dist. v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1404.)

Student had low cognitive ability resulting in significant academic need.  Student was unable to read or write sentences, engage in conversation, or communicate with more than approximations of three-word utterances.  Student was unable to access general education core curriculum, instead needing modified standards derivative of the common core curriculum.  Even with modified curriculum, Student's sixth grade teacher had to modify the curriculum further for Student by providing Student with added visual supports.  Student was averse to paper and pencil tasks and required prompting and redirection every few minutes.  Student could only work on a task for up to five minutes before needing a break.

Student demonstrated significant social delays as well, preferring preschool level toys, and did not engage in symbolic or parallel play.  Student required intensive, individualized services and ongoing support.  Student's interactions with nondisabled peers occurred during PE, lunchtime, and breaks, and those interactions were limited to brief greetings due to Student's communication deficits.  Student walked around

during PE, and Student's interactions with the general education students during that time were short-lived.

Student had significant behavior needs as well, which impeded the learning of Student and others. Bowman and school psychologist Carrie Ann Alamillo were each called at various times to assist with Student's maladaptive behaviors in the classroom. Alamillo provided support for about an hour almost every day because of Student's aggression to staff, as well as his climbing, desk flipping, property destruction, and pulling things off walls. Classroom aides Jaclyn Rojas and Melanie Briglio, as well as Student's teacher for the 2021-2022 school year, Cari Stanley, described similar behavior. Student also tended to roam the classroom and elope. Antecedents for problem behavior included tasks that Student perceived as too difficult. Neither party introduced evidence about the comparative costs of placing Student in a general education environment for 50 percent of the school day versus 30 percent.

Laurel Rexon testified on behalf of Student and in favor of increased inclusion in general education. At the time of hearing, Rexon had been a school psychologist within the Los Angeles Unified School District for over 12 years. Of that time, Rexon worked as a school psychologist in a middle school setting for four years. The high school campus where Rexon worked at the time of hearing had a large moderate to severely disabled student population. As a school psychologist, Rexon conducted psychoeducational assessments, participated in IEP team meetings, and provided individual counseling to students. Rexon was credentialed to teach children with mild to moderate disabilities and had been a special education teacher for kindergarten, first, and second grade students for eight years prior to becoming a school psychologist for Los Angeles.

Rexon observed Student, with Parent, in the home setting via a video call for approximately 10 minutes, two days before testifying at hearing. Rexon also reviewed

the December 8, 2021, IEP, as well as Student's psychoeducational assessment and functional behavior analysis.  Rexon opined that Student should have been placed in the general education setting for 50 percent of school time, since 31 percent was not enough for Student to make mainstreaming progress.  Rexon opined that, with the help of a one-to-one aide, modified curriculum, and collaboration between the general education teacher and special education teacher, Student could be included in general education in areas like art, music, health, social studies, science, and history.  For the seventh grade, Rexon suggested that Student could be involved in general education classes like health and any hands-on electives like dance, gardening, and band.  Rexon's suggestion was based on the visual and hands-on nature of those subjects.  Rexon agreed that Student would still need special education in the areas of math and English language arts.

Rexon suggested that while in a general education class, Student could work on curriculum parallel to the general education curriculum, but specifically tailored to his abilities.  Student could take these lessons on an electronic tablet (one of Student's preferred items) and do other hands-on tasks with the help of a one-to-one aide. The aide could assist Student with frequent breaks, taking a walk if Student's attention waned, and managing any maladaptive behaviors.  Rexon suggested that Student could work on IEP goals between special education and general education classes, depending on which goals lent themselves to each setting.  Rexon opined that, even with a child with low academic skills such as Student, mainstreaming in this way would help shape Student's behavior and language, and such benefit could extend to Student's social and emotional health.  Rexon opined that Student could even glean some educational benefit by being exposed to seeing and hearing information presented during general education instruction, even if Student was not involved in those class lessons.

25

Unlike members of the IEP team, Rexon had not observed Student in a classroom setting at all.  Rexon was not credentialed to teach a moderate to severe special education class.  Rexon was not familiar with Student's school or classroom.  As such, Rexon's opinions regarding Student's ability for increased mainstreaming were not persuasive.

Parent also testified in favor of increased inclusion.  Parent operated a small family home, licensed as a small family facility, for 12 or 13 years, and always had school aged children with disabilities throughout that time.  Student was placed in Parent's care through a regional center since Student was two years old.  Parent was trained as a registered behavior technician and as a direct support professional.  Parent observed Student interact with other typical children within Parent's extended family.  Parent did not notice any aggressive behavior at home, and described Student as happy, smiling, and easy to redirect.  Parent had not observed Student in a classroom setting during the statutory period at issue.  For this reason, Parent's opinion regarding Student's ability for increased mainstreaming was not persuasive.

Student required instruction with substantial individualization, and specialized academic instruction taught by a credentialed special education teacher.  Student's placement in a special day class offered a small class size, a low student-to-instructor ratio, and a setting in which Student could work on adaptive skills.  The teacher and aides in Student's special day class were familiar with the communication strategies to be used with Student and received consultation from a speech language pathologist. Student benefitted from interacting with at least one other special education classmate who, like Student, also used visual cues to express needs and wants.

Even assuming that a one-to-one aide could address Student's behavioral concerns in a general education context, and even if Student received all other

modifications, accommodations and supports, Student's lower cognitive ability required a completely modified curriculum. Student's plan for greater academic inclusion would have Student operating largely in parallel to and isolated from his general education peers and would not provide Student with the inclusion benefit that Student sought. While Student appears to advocate for a lesser restricted environment, Student's plan for more time in general education would have the opposite effect, resembling a more restrictive independent placement within a general education classroom.

Student did not establish that increased time in general education would have been an appropriate placement in which Student could have his academic and behavioral needs met to receive educational benefit. Rather, the evidence established that increased time in general education would not have been appropriate for Student, given Student's profound needs. As such, a comparison of which percentage of general education placement would have constituted the least restrictive environment is unnecessary. Even so, Student failed to establish that Etiwanda's placement offer was not the least restrictive environment upon consideration of the *Rachel H.* factors. Etiwanda did not deny Student a FAPE by ailing to offer Student placement in a general education classroom for 50 percent of Student's school day.

ISSUE 3.I. AND 3.J.: DID ETIWANDA'S DECEMBER 8, 2021, IEP DENY STUDENT A FAPE BY FAILING TO OFFER STUDENT APPROPRIATE SPEECH AND LANGUAGE AND OCCUPATIONAL THERAPY SERVICES?

Student contends that Etiwanda denied Student a FAPE by failing to offer appropriate occupational therapy and speech and language services. Etiwanda contends that its offer of occupational therapy and speech and language services in the December 8, 2021, IEP was appropriate.

27

SPEECH AND LANGUAGE SERVICES

Etiwanda offered Student 60 20-minute sessions of individual pull-out speech and language sessions, as well as 30 20-minute group sessions of combination push-in and pull-out speech and language sessions. Etiwanda also offered one 20-minute group session for the extended school year. Wilkerson credibly established that the speech and language services offered were based on accurate present levels of performance and were adequate to address Student's receptive and expressive and pragmatics communication needs. Because no other speech and language goals were offered, these minutes did not address Student's intelligibility and sound production needs.

OCCUPATIONAL THERAPY SERVICES

In the December 8, 2021 IEP, Etiwanda offered Student 25 sessions of individual push-in occupational therapy per year for 20 minutes each session, as well as two more such sessions for the extended portion of the school year. It also offered 10 minutes a month of consultation between the occupational therapist and classroom teacher and staff for the duration of the IEP. Hardy credibly testified that these minutes were meant to address Student's one occupational therapy goal in tracing.

Student's expert Goodiss opined that occupational therapy services should be increased to two 20-minute sessions a week, but the amount of time spent on non-preferred tasks like tracing should be decreased. Goodiss opined Student should instead work on other areas like coordination, grasp, and attention. Goodiss also suggested that non-preferred tasks like tracing be paired with a preferred task. While additional occupational therapy in areas like coordination, grasp, and attention may have benefitted Student, these additional areas did not address Student's educational related

28

needs as determined by Hardy's occupational assessment, specifically, fine motor and visual motor skills, praxis/motor planning, and social participation. As such, Goodiss' recommendation on the amount of increase in occupational therapy was not persuasive.

Hardy opined that a tracing goal was necessary for Student to achieve greater independence in writing. Student could only trace five percent of tracing work without hand-over-hand assistance. Tracing was a non-preferred task for Student. Student's attention to fine motor and paper and pencil tasks was limited. Hardy credibly established that increased occupational therapy minutes would not have been helpful toward a tracing goal, however, because of Student's limited attention span and aversion to paper and pencil work. This opinion was corroborated by Goodiss, Student's occupational therapy witness as well.

Etiwanda established that the frequency and duration of occupational therapy services were adequate to address Student's fine motor and visual motor tracing goal. The occupational therapy service offered was not, however, adequate to address Student's praxis/motor planning or social participation needs, because Etiwanda did not offer goals in those areas, as discussed in Issue 5. Student proved that the December 8, 2021, IEP failed to offer Student a FAPE by failing to offer appropriate related services to meet Student's intelligibility and sound production, vocabulary development, praxis/motor planning, and social participation needs.

ISSUE 3.K.: DID ETIWANDA'S DECEMBER 8, 2021, IEP DENY STUDENT A FAPE BY FAILING TO OFFER STUDENT A PHYSICAL THERAPY INDEPENDENT EDUCATIONAL EVALUATION?

Student contends that Etiwanda should have offered a physical therapy independent educational evaluation and funded physical therapy by a non-public

agency based on the results of the independent evaluation.  Etiwanda contends that it had no such duty.

A district must assess a child in all areas of suspected disability.  (20 U.S.C. § 1414(b)(3)(B); Ed. Code, § 56320, subd. (f).)  School district evaluations of students with disabilities under the IDEA serve two purposes: identifying students who need specialized instruction and related services because of an IDEA-eligible disability and helping IEP teams identify the special education and related services the student requires.  (34 C.F.R. §§ 300.301 and 300.303.)

The procedural safeguards of the IDEA provide that under certain conditions, a parent is entitled to obtain an independent evaluation of a child at public expense.  (20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502(a) & (b) (2006); Ed. Code, §§ 56329, subd. (b), 56506, subd. (c).)  An independent evaluation is an evaluation conducted by a qualified examiner not employed by the school district.  (34 C.F.R. § 300.502(a)(3)(i).)  A parent has the right to request an independent evaluation at public expense if the parent disagrees with an evaluation obtained by the school district.  (34 C.F.R. § 300.502(b)(1); Ed. Code, § 56329, subd. (b).)  While the public agency may ask for a parent's reason for objecting to the public evaluation, the public agency may not require such explanation or unreasonably delay either providing the independent evaluation or file a due process complaint seeking to defend the public assessment.  (34 C.F.R. § 300.502(b)(4).)

Allen performed Etiwanda's physical therapy assessment of Student in April 2021. Physical therapist Barbara Heidelman presented Allen's report to the IEP team on December 8, 2021.

Parent requested, by email from Parent representative dated January 3, 2022, that Etiwanda fund an evaluation by a non-public physical therapist of Parent's choice, and

that Etiwanda fund non-public physical therapy services based on such an evaluation. On January 18, 2022, Etiwanda sent Parent a prior written notice denying this request, stating, "if you disagree with the results of the District's physical therapy assessment and are requesting an independent educational evaluation, then please let me know so the District can respond accordingly."  Student's January 3, 2022, request for an independent physical therapy evaluation, was, by its nature, a disagreement with Etiwanda's physical therapy assessment, regardless of whether Student explained the reason why.  It triggered Etiwanda's obligation to either fund an independent evaluation or to file for a due process determination that the district assessment was legally compliant.  Etiwanda did not do so.  (34 C.F.R. § 300.502(b)(4).)

In matters alleging procedural violations, the denial of a FAPE may only be shown if the procedural violations impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE or caused a deprivation of educational benefits.  (Ed. Code, § 56505, subd. (f)(2); see also *W.G., et al. v. Bd. of Trustees of Target Range Sch. Dist., etc.* (9th Cir. 1992) 960 F.2d 1479, 1484 ("*Target Range*"), *superseded in part by statute on other grounds*.)  The hearing officer "shall not base a decision solely on non-substantive procedural errors, unless the hearing officer finds that the non-substantive procedural errors resulted in the loss of an educational opportunity to the pupil or interfered with the opportunity of the parent or guardian to participate in the formulation process of the individualized education program."  (Ed. Code, § 56505, subd. (j).)

Procedural violations that interfere with parental participation in the development of the IEP "undermine the very essence of the IDEA."  (*Amanda J. v. Clark County Sch. Dist.* (9th Cir. 2001) 267 F.3d 877, 892 (*Amanda J.*).)  An IEP cannot address the child's unique needs if the people most familiar with the child's needs are not involved or fully

31

informed. (*Ibid.*)  A school district cannot independently develop an IEP without input or participation from the parents and other required members of the IEP team.  (*Target Range, supra,* 960 F. 2nd at p. 1484.)

Parent sought additional information on Student's physical therapy needs by requesting an independent physical therapy assessment.  This request triggered Etiwanda's obligation to provide the requested assessment or file for due process to defend its assessment.  Failing to do either was a procedural violation of the IDEA.  The information Parent sought was critical to Parent's ability advocate for the services.  Not having this information deprived Parent of meaningful participation in a discussion of Student's physical therapy needs and what appropriate physical therapy services should be.  Etiwanda significantly impeded the Parent's opportunity to participate in the decision-making process regarding the provision of a FAPE.  As such, Etiwanda denied Student a FAPE by failing to fund an independent physical therapy educational evaluation.

## ISSUE 4: DID ETIWANDA PREVENT PARENT FROM MEANINGFULLY PARTICIPATING IN THE DEVELOPMENT OF STUDENT'S IEP BY HOLDING STUDENT'S DECEMBER 8, 2021, IEP TEAM MEETING WITHOUT PARENT?

Student contends that Etiwanda denied Student a FAPE because it prevented Parent from meaningfully participating in the development of Student's IEP by holding Student's December 8, 2021 IEP team meeting without Parent.  Etiwanda contends that it made all reasonable effort to gain Parent's attendance at the IEP team meeting and thus did not deny Student a FAPE regarding this contention.

Federal and State law require that parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to the identification,

assessment, educational placement, and provision of a FAPE to their child.  (20 U.S.C. § 1414(d)(1)(B)(i); Ed. Code, §§56304, 56342.5.)  A school district must ensure that the parent of a student who is eligible for special education and related services is a member of any group that makes decisions on the educational placement of the student.  (Ed. Code, §56342.5.)  Among the most important procedural safeguards are those that protect the parents' right to be involved in the development of their child's educational plan.  (*Amanda J.*, at p. 882.) Accordingly, at the IEP team meeting, parents have the right to present information in person or through a representative.  (Ed. Code, § 56341.1.)

A district must notify parents of an IEP team meeting early enough to ensure that they will have an opportunity to attend, and it must schedule the meeting at a mutually agreed on time and place.  (34 C.F.R. § 300.322(a)(1) & (a)(2); Ed. Code, §§56043, subd. (e); 56341.5, subds. (b), (c).)  A district may not conduct an IEP team meeting in the absence of parents unless it is unable to convince the parents that they should attend, in which case it must keep a record of its attempts to arrange a mutually agreed on time and place.  Those records should include detailed records of telephone calls, correspondence, and visits to the parents' home or place of employment. (34 C.F.R. § 300.322(d); Ed. Code, §56341.5, subd. (h).)

Etiwanda proposed over ten different IEP team meeting dates to Parent during the almost eight months between April 16, 2021, until the IEP team meeting was ultimately held without Parent on December 8, 2021.  For each proposed date, Etiwanda sent meeting notices to Parent and Parent's representative via email and United States mail.  Often, Etiwanda also sent Parent meeting notices via hard copy in Student's backpack, as well as voicemail.  Etiwanda's meeting notices largely went unanswered by either Parent or Parent's representative.

For three of those dates, however, Parent's representative asked to reschedule the IEP team meeting. On October 14, 2021, Parent proposed two meeting dates for the following week. Etiwanda could not gather the required attendees in time for the dates proposed by Parent, so on October 20, 2021, Etiwanda issued a prior written notice proposing three other meeting dates and times: November 5, 2021, at 9:00 am, December 7, 2021 at 1:00 pm, or December 8, 2021 at 1:00 pm. The notice also stated that if Etiwanda did not receive a response from Parent, the IEP team meeting would be held without Parent on December 8, 2021.

By December 6, 2021, Etiwanda had received no response from either Parent or Parent's representative, despite issuing several additional meeting notices and prior written notices reiterating the meeting information. On December 6, 2021, Etiwanda emailed Parent the Zoom link for the December 8, 2021, IEP team meeting. Parent responded via email, saying that Parent would check with Parent's representative.

Neither Parent, nor Parent's representative, attended the December 8, 2021, IEP team meeting. The IEP Team waited 15 minutes to begin the meeting. The virtual meeting lasted for approximately two hours, and Parent did not join at any point during the meeting.

A school district may not hold an IEP team meeting without parent because the district has difficulty in scheduling the meeting with parent, even when the deadline for completing the IEP is fast approaching. (*Doug C. v. Hawaii Dept. of Educ.* (9th Cir. 2013) 720 F.3d 1038, 1045-46 (*Doug C.*).) The fact that it may have been frustrating to schedule meetings with a parent or difficult to work with a parent does not excuse a district's failure to include the parent in an IEP team meeting when the parent expressed a willingness to participate. (*Id.,* at p. 1045.) Further, a district must include parents in an IEP team meeting unless the parents "affirmatively refuse" to attend. (*Id.,* at p. 1044;

*Shapiro v. Paradise Valley Unified Sch. Dist.*, 317 F.3d 1072, 1078 (9th Cir.2003), *superseded on other grounds by* 20 U.S.C. § 1414(d)(1)(B).)  The parent in *Doug C.* did not affirmatively refuse to attend the IEP team meeting, but rather actively sought to reschedule the meeting in order to participate.  As such, The Ninth Circuit found that the Hawaii Department of Education's exclusion of the parent from the IEP team meeting amounted to a denial of FAPE.  (*Doug C.*, at p. 1079.)

There is no doubt that Parent was largely uncooperative, largely unresponsive, and difficult to work with in scheduling an IEP team meeting.  Parent sought to reschedule a scheduled IEP team meeting three times, and two of those times were on the same day as the IEP team meeting.

But at no time did Parent affirmatively refuse to attend an IEP team meeting. Rather, on October 14, 2021, Parent suggested two meeting dates the following week. While Etiwanda could not gather the required attendees in time for Parent's proposed dates, Parent's October 14, 2021 communication indicated Parent's willingness and desire to participate in the IEP team meeting.  When emailed the Zoom link for the December 8, 2021 IEP team meeting, Parent responded that she would check with her advocate.  And yet at no time during the December 8, 2021, IEP team meeting did Etiwanda follow up with Parent during the meeting to find out why Parent was not in attendance.

Etiwanda's attempts at scheduling an IEP team meeting were unilateral, characterized by letters sent to Parent with a proposed date.  When one proposed date did not work, Etiwanda sent another letter proposing another date.  While this approach may have been an appropriate way to begin the IEP-scheduling process, at some point Etiwanda should have realized that proposing a series of unilateral dates, or even choices of dates, to Parent did not result in "mutually agreeable" meeting dates as

required by law.  (34 C.F.R. § 300.322(a)(2); Ed. Code, § 56341.5, subd. (c).)  At no time did Etiwanda change its approach during the nearly eight-month period it sought to schedule a meeting with Parent to explore other ways to collaboratively schedule a mutually agreeable IEP team meeting with Parent.  Student established that Etiwanda did prevent Parent from meaningfully participating in the development of Student's IEP by holding Student's December 8, 2021, IEP team meeting without Parent.

## CONCLUSIONS AND PREVAILING PARTY

As required by California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.

Issue 3.a.: Etiwanda did not deny Student a FAPE by failing to offer Student appropriate goals in the areas of listening comprehension, vocabulary, sorting, one-to-one correspondence, personal information, functional equivalent replacement behavior, general positive behavior, and pragmatics and social skills in the December 8, 2021 IEP.  Etiwanda prevailed on Issue 3.a.

Issue 3.b.: Etiwanda did not deny Student a FAPE by failing to offer Student a behavior intervention plan in the December 8, 2021, IEP.  Etiwanda prevailed on Issue 3.b.

Issue 3.c.: Etiwanda did not deny Student a FAPE by failing to offer appropriate services to address Student's auditory processing sensory deficits in the December 8, 2021 IEP.  Etiwanda prevailed on Issue 3.c.

Issue 3.d.: Etiwanda did not deny Student a FAPE by failing to offer a one-to-one aide during round trip transportation to school in the December 8, 2021 IEP.  Etiwanda prevailed on Issue 3.d.

Issue 3.e.: Etiwanda did not deny Student a FAPE by failing to offer a placement of 50 percent in general education in the December 8, 2021 IEP.  Etiwanda prevailed on Issue 3.e.

Issue 3.f.: Etiwanda did not deny Student a FAPE by failing to offer home applied behavior analysis therapy and clinic meetings in the December 8, 2021 IEP.  Etiwanda prevailed on Issue 3.f.

Issue 3.g.: Etiwanda did not deny Student a FAPE by failing to offer parent training to address Student's behavioral issues in the December 8, 2021 IEP.  Etiwanda prevailed on Issue 3.g.

Issue 3.h.: Etiwanda did not deny Student a FAPE by failing to offer equestrian therapy in the December 8, 2021 IEP.  Etiwanda prevailed on Issue 3.h.

Issue 3.i.: Etiwanda denied Student a FAPE by failing to offer appropriate speech and language services in the December 8, 2021 IEP.  Student prevailed on Issue 3.i.

Issue 3.j.: Etiwanda denied Student a FAPE by failing to offer appropriate occupational therapy services in the December 8, 2021 IEP.  Student prevailed on Issue 3.j.

Issue 3.k.: Etiwanda denied Student a FAPE by failing to fund an independent educational evaluation in physical therapy.  Student prevailed on Issue 3.k.

Issue 3.l.: Etiwanda did not deny Student a FAPE by failing to offer behavior counseling in the December 8, 2021 IEP.  Etiwanda prevailed on Issue 3.l.

Issue 3.m.: Etiwanda did not deny Student a FAPE by failing to offer tutoring by a non-public agency in the December 8, 2021 IEP.  Etiwanda prevailed on Issue 3.m.

Issue 4: Etiwanda denied Student a FAPE by holding the December 8, 2021 IEP team meeting without Parent and preventing Parent from meaningfully participating in the development of Student's IEP.  Student prevailed on Issue 4.

Issue 5: Etiwanda's December 8, 2021 IEP did not offer Student a FAPE such that Etiwanda could implement it without Parent's consent.  Student prevailed on Issue 5.

## REMEDIES

Student prevailed on Issues 3.i., 3.j., 4, and 5.  Student is entitled to a remedy for the denial of FAPE.  Etiwanda denied Student a FAPE as discussed above, and is not entitled to Implement the December 8, 2021 IEP without parental consent.

In remedying a FAPE denial, the student is entitled to relief that is "appropriate" in light of the purposes of the IDEA.  (20 U.S.C. § 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3) (2006).)  Appropriate relief means "relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." (*Puyallup, supra,* 31 F.3d. at p. 1497.)  School districts may be ordered to provide compensatory education or additional services to a student who has been denied a FAPE.  (*Puyallup, supra,* at p. 1496.)

Compensatory education is a prospective award of educational services designed to catch-up the student to where he should have been absent the denial of a FAPE. (*Brennan v. Regional School Dist. No. 1* (D.Conn. 2008) 531 F.Supp.2d 245, 265; *Orange*

*Unified School Dist. v. C.K.* (C.D.Cal. June 4, 2012, No. SACV 11–1253 JVS(MLGx)) 2012 WL 2478389, *12.)  The award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.  (*Reid v. District of Columbia* (D.C.Cir. 2005) 401 F.3d 516, 524 (*Reid*).)  An award of compensatory education need not provide a day-for-day compensation.  (*Parents of Student W. v. Puyallup Sch. Dist., No. 3* (9th Cir. 1994) 31 F.3d 1489, 1496-1497 (*Puyallup*).)  The conduct of both parties must be reviewed and considered to determine whether equitable relief is appropriate.  (*Id.* at p. 1496.)

As remedies, Student seeks several independent assessments, compensatory relief, reimbursements, a monetary award for retaliatory conduct and violations of federal and constitutional rights, and legal fees and costs.  Much of the relief Student seeks is not supported by the law or evidence or argued in Student's closing brief. The relief to which Student is entitled, based on the evidence, is discussed below.

Etiwanda failed to offer Student goals to address Student's deficiencies in praxis/motor planning, social participation, and intelligibility and sound production, and as such failed to offer Student services to address those areas.  Etiwanda's vocabulary development goal was not measurable, and Student is entitled to additional services to address that failure.

Student did not present any expert testimony or other credible evidence regarding the type or amount of appropriate compensatory services.  Ultimately, the undersigned relied upon equitable judicial discretion to craft an appropriate compensatory education remedy, making a qualitative analysis that took into account Student's age, nature of Student's disability and need, and the amount of time between the date of the December 8, 2021 IEP and the date Student filed the complaint.

39

A compensatory award is an equitable remedy that depends upon a fact-specific and individualized assessment of a student's current needs. (*Puyallup, supra,* 31 F.3d at p. 1496; *Reid, supra,* 401 F.3d at p. 524.) ALJs have broad latitude to fashion appropriate equitable remedies for FAPE denials. (*School Comm. of Burlington v. Department of Educ.* (1985) 471 U.S. 359, 370 [105 S.Ct. 1996, 85 L.Ed.2d 385]; *Puyallup, supra*, 31 F.3d 1489, 1496.)

Considering all relevant factors, Etiwanda is ordered to provide Student with five hours of speech and language services and five hours of occupational therapy services as compensatory services for Etiwanda's FAPE denials in Issues 3.i., 3.j., and 5. Student also prevailed on Issue 3.k. On January 3, 2022, Student requested an independent physical therapy assessment. Etiwanda failed to either fund the independent assessment or file a due process action to defend its own physical therapy assessment, significantly depriving Parent of the opportunity to participate in the development of Student's IEP services.

An independent educational evaluation is an evaluation conducted by a qualified examiner not employed by the public agency responsible for the education of the student in question. (34 C.F.R. § 300.502 (a)(3)(i).) If an independent educational evaluation is at public expense, the criteria under which the evaluation is obtained, including the location of the evaluation and the qualifications of the examiner, must be the same as the criteria the public agency uses when it initiates an evaluation, to the extent those criteria are consistent with the parent's right to an independent educational evaluation. (34 C.F.R. § 300.502(e)(1).) Except for these criteria, the public agency may not impose conditions or timelines related to obtaining the independent educational evaluation at public expense. (34 C.F.R. § 300.502(e)(2.)

40

Student is entitled to an independent educational evaluation in the area of physical therapy. The independent physical therapy evaluation shall be conducted by a licensed physical therapist of Parent's choice. The independent evaluation shall comply with Etiwanda's guidelines for independent educational evaluations. Etiwanda shall invite the independent assessor to attend the IEP team meeting during which the assessment will be reviewed and shall fund two hours of the assessor's time for travel and meeting attendance.

Because of Etiwanda's failure to ensure Parent's participation in the IEP team meeting, training in legally-complaint IEP team meeting scheduling is appropriate. All of Student's other requests for relief are denied.

ORDER

1. Etiwanda may not implement the December 8, 2021, IEP without parental consent.

2. Etiwanda shall fund five hours of direct, individual, in-person speech and language services for Student provided by a certified nonpublic agency of Parent's choice. Etiwanda must establish direct payment to any certified nonpublic agency selected by Parent.

3. Etiwanda shall fund five hours of direct, individual, in-person occupational therapy services for Student provided by a certified nonpublic agency of Parent's choice. Etiwanda shall establish direct payment to any certified nonpublic agency selected by Parent.

4. Once a contract is established with a certified nonpublic agency or agencies, Parent must coordinate the dates, times, and location of the compensatory services directly with the selected agency. The compensatory services may be

provided at home, school, or another location determined by the nonpublic agency and Parent.

5.  If the compensatory services are provided at the provider's location, Etiwanda must either provide round trip transportation to the services or reimburse Parent for transportation at the federal rate established by the Internal revenue Service according to proof, pursuant to Parent's election.

6.  Student has until June 1, 2023, to use the compensatory services.  Any services not used by that date will be forfeited.

7.  Etiwanda shall fund an independent educational evaluation in the area of physical therapy for the purpose of determining Student's educationally related physical therapy needs.

8.  The independent educational evaluation in the area of physical therapy must be conducted by a licensed physical therapist of Parent's choice, who meets Etiwanda's guidelines.

9.  Etiwanda must fund the independent physical therapy evaluation of Student including the selected assessor's time to conduct the evaluation, review of records, school observations, and interviews of school staff, Parent, and Student, at the assessor's usual hourly rate, providing the assessor's rate does not exceed the typical hourly rate for such assessments in the professional community.

10. Etiwanda must fund up to two hours for the assessor to prepare for and attend, in-person or virtually, an IEP team meeting to present the evaluation findings, plus mileage reimbursement at the federal Internal Revenue Service business reimbursement rate based upon proof.

11. Etiwanda shall contract with the selected assessor within 15 days of receiving notice of Parent's selection.

12. Etiwanda shall convene an IEP team meeting within 15 days of receipt of the independent educational evaluation, to consider the results of the report, unless Etiwanda and Parent agree to a different timeline.

13. Within six months of the date of this order, Etiwanda shall provide one hour of training on the topic of IDEA-complaint parent participation in IEP team meetings.  The training shall be provided to all Etiwanda employees at Student's school site and at the district level that are responsible for arranging IEP team meetings.  The training shall be provided by a qualified professional or professionals selected by Etiwanda, but not employed by Etiwanda.  Training must be provided by professionals who are knowledgeable about the requirements and procedures for IDEA-compliant parent participation in IEP team meetings.

14. All other requests for relief are denied.

## RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by it.  Pursuant to Education Code section 56505, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within 90 days of receipt.

*Claire Yazigi*

CLAIRE YAZIGI

Administrative Law Judge

Office of Administrative Hearings