UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 22-1446 JGB (SHKx)** | Date | January 11, 2024 |
|---|---|---|---|
| Title | *Etiwanda School District v. D. P.* | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   FINDINGS OF FACT AND CONCLUSIONS OF LAW (IN CHAMBERS)

      This matter involves an appeal of an administrative special education due process hearing before the California Office of Administrative Hearings ("OAH") pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA").  Plaintiff Etiwanda School District ("District" or "Plaintiff") seeks partial reversal of an OAH decision in which Administrative Law Judge Claire Yazigi ("ALJ") found that (1) the Individualized Education Program ("IEP") prepared for minor student D.P. ("Defendant") denied Defendant a free, appropriate public education ("FAPE"), which is owed to Defendant under the IDEA, and (2) the District prevented Defendant's parent ("Parent") from meaningfully participating in the development of Defendant's IEP by holding the IEP meeting without them.  ("Complaint," Dkt. No. 1.)  For the reasons set out below, the Court **AFFIRMS** the OAH Decision.

## I.   BACKGROUND

      On August 16, 2022, the District filed a complaint against Defendant D.P., a minor ("D.P."). ("Complaint," Dkt. No. 1) seeking judicial review of the ALJ decision.  (Id.)  On October 5, 2022, D.P. answered.  ("Answer," Dkt. No. 11.)  On January 13, 2023, the parties filed a Joint Rule 26(f) Report.  ("Report," Dkt. No. 14.)  On January 25, 2023, the Court set a briefing schedule.  ("Scheduling Order," Dkt. No. 15.)  Pursuant to that schedule, on March 15, 2023, Plaintiff filed a motion requesting modified de novo review and partial reversal of the ALJ's decision.  ("Motion," Dkt. No. 17.)  On April 28, 2023, Plaintiff submitted a notice stating that D.P. had not submitted an opposition to Plaintiff's Motion.  (Dkt. No. 20.)

On June 16, 2023, the Court issued an order to show cause in writing why D.P. failed to file his cross motion and an opposition or notice of non-opposition to Plaintiff's Motion in accordance with the deadlines in the Scheduling Order. ("OSC," Dkt. No. 21.) The Court also ordered D.P. to file an opposition or a notice of non-opposition to Plaintiff's Motion by Friday, June 30, 2023. (Id.) On June 23, 2023, D.P. timely responded, indicating that D.P.'s counsel were ill and had technical difficulties with their email. ("Response," Dkt. No. 22.) On June 27, 2023, the Court discharged the OSC, ordered D.P. to file an opposition or a notice of non-opposition to Plaintiff's Motion by July 3, 2023, and ordered D.P. to file his cross motion by July 10, 2023. ("June 27, 2023 Order," Dkt. No. 23.)

On July 3, 2023, D.P. filed an opposition to Plaintiff's Motion. ("Opposition," Dkt. No. 24.) On July 6, 2023, Plaintiff filed a request for clarification of the Court's June 27, 2023 Order, requesting that it be allowed to provide briefing and documentary evidence to support its contention that D.P.'s counsel was not ill contrary to D.P.'s counsel's assertions in its Response to the Court's OSC, and asking that if the Court would not allow Plaintiff to provide briefing in support of its contention regarding D.P.'s counsel's conduct, then the Court would clarify whether Plaintiff may file an opposition and/or reply to D.P.'s Opposition and D.P.'s future cross motion. ("Clarification Request," Dkt. No. 25.) The Court declined to allow Plaintiff to respond to D.P.'s Response to the Court's OSC and instructed Plaintiff may file a reply to D.P.'s Opposition. ("Order on Clarification Request," Dkt. No. 29.) Because D.P. did not file a cross motion, the Court concluded that Plaintiff's request to file an opposition to the cross motion is moot. (Id.)

## II. LEGAL STANDARD

### A. IDEA, IEP, and FAPE

As stated in the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA"), a primary purpose of the Act is to assure that all children with disabilities have available to them a free, appropriate public education ("FAPE") that emphasizes special education and related services designed to meet their unique needs. 20 U.S.C. § 1400(c). Under the Supreme Court's 1982 decision interpreting this provision of the Act, a FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 188–89 (1982).

The Supreme Court concluded that states must provide a "basic floor of opportunity" to disabled students, and that Congress "did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful." Rowley, 458 U.S. at 197; see also J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 947, 951 (9th Cir. 2010) (citing Rowley as to standards governing FAPE and holding that Rowley remains binding precedent).

The IDEA requires that states and local educational agencies ("LEAs") that receive IDEA funds offer a FAPE to students who have qualifying disabilities. Fry v. Napoleon Community Schls., 580 U.S. 154 (2017). If a parent disagrees with what an IEP offers, she may file for a due process hearing. 20 U.S.C. § 1415(b)(6).

**B.    Judicial Review of IDEA Administrative Decisions**

Under Section 1415(e)(2) of the IDEA, a district court reviewing a state administrative decision shall base its decision "on the preponderance of the evidence." 20 U.S.C. § 1415(e)(2). The Ninth Circuit has interpreted this as calling for de novo review of the appropriateness of an education program. Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994); see also M.L. v. Fed. Way Sch. Dist., 394 F.3d 634, 642 (9th Cir. 2005) ("We review de novo whether a school district's proposed IEP provides a FAPE under the IDEA.") However, it has cautioned that federal courts must give "due weight" to judgments of education policy in reviewing state hearings and "should not substitute their own notions of sound educational policy for those of the school authorities which they review." Smith, 15 F.3d at 1524 (internal quotation marks omitted). This cautionary approach is reiterated by the Supreme Court, which warned in 1982, "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206–07 (1982).

Thus, the standard of review has been characterized as "modified de novo review," because, although the court may decide questions of law and fact, it should afford deference to the state's "specialized knowledge and experience," particularly where ALJ findings are "thorough and careful." Ashland Sch. Dist. v. Parents of Student E.H., 583 F. Supp. 2d 1220, 1222–23 (D. Or. 2008), aff'd, 587 F.3d 1175 (9th Cir. 2009); see also J.G. v. Douglas Cnty. Sch. Dist., 552 F.3d 786, 793 (9th Cir. 2008) (the Ninth Circuit gives "due weight to the state administrative proceedings" and gives "particular deference to thorough and careful administrative findings") (internal quotations omitted).

Furthermore, in an action for judicial review of an administrative decision, the burden of persuasion rests with the party challenging the ALJ's decision. L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 910 (9th Cir. 2009); see also C.L. v. Lucia Mar Unified Sch. Dist., No. CV 12-9713 CAS PJWX, 2014 WL 117339, at *2 (C.D. Cal. Jan. 9, 2014), aff'd sub nom. C.L. ex rel. V.L. v. Lucia Mar Unified Sch. Dist., No. 14-55119, 2016 WL 1169960 (9th Cir. Mar. 25, 2016) (same). Accordingly, Plaintiff here bears the burden of showing that the ALJ's decision does not deserve deference, and that the preponderance of the evidence shows that the District's IEP does not provide a FAPE under the IDEA.

C.     **Findings of Fact**[1]

"In bench trials, Fed. R. Civ. P. 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.'" Vance v. American Hawaii Cruises, Inc., 789 F.2d 790, 792 (9th Cir. 1986) (quoting Fed. R. Civ. P. 52(a)).  "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the basis of the trial court's decision.  This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions." Id. (citations omitted).

Findings of fact can be overturned only when clearly erroneous.  Amanda J. ex rel. Annette J. v. Clark County School District, 267 F.3d 877, 887 (9th Cir. 2001); see Federal Rule of Civil Procedure 52(a).  A finding of fact is clearly erroneous when the evidence in the record supports the finding but "the reviewing court is left with a definite and firm conviction that a mistake has been committed." Id. (citing Burlington Northern, Inc. v. Weyerhaeuser Co., 719 F.2d 304, 307 (9th Cir. 1983).

## III.     DISCUSSION

A.     **Request for Judicial Notice**

The District requests that the Court take judicial notice, pursuant to Federal Rule of Evidence 201, of two documents: (1) a March 27, 2015 decision issued by the Oregon Department of Education, 115 LRP 17208 (the "Oregon Dept. of Edu. Decision"); and (2) an August 20, 2021 Decision in Parent on Behalf of Student v. Chaffey Joint Union High School District, Office of Administrative Hearings Case No. 2020120161 ("Chaffey Decision"). ("RJN," Dkt. No. 19.)   Defendant does not oppose the RJN.  Proceedings of other courts, including orders and filings, are the proper subject of judicial notice when directly related to the case, though not for the truth of the contents of the underlying documents.  See United States ex. Rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 917 F.2d 244, 248 (9th Cir. 1992) (holding that courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"); Neilson v. Union Bank of California, N.A., 290 F. Supp. 2d 1101, 1113 (C.D. Cal. 2003) ("[C]ourt orders and filings are the type of documents that are properly noticed under [Fed. R. Evid. 201(b).]"); Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006).  Accordingly, the decisions are subject to judicial notice and the Court **GRANTS** the RJN.

//
//

---

[1] The Court elects to issue its decision in narrative form because a narrative format more fully explains the reasons behind the Court's conclusions, which aids appellate review.  Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

B.  **Findings of Fact**

The following constitutes the lion's share of the Court's findings of fact based on the Administrative Record.  The ALJ made additional findings of fact specific to the issues on appeal here, and those issue-specific facts are considered more fully below.

1. **D.P.'s Background**

At the time of the OAH hearings in March and April 2022, D.P. was a 12-year-old boy in sixth grade and resided in the geographic boundaries of the Etiwanda School District at all relevant times.  ("OAH Decision," Dkt. No. 1-1 at 5.)  D.P. received special education and related services based on a primary eligibility of Multiple Disabilities ("MD") including Intellectual Disability ("ID"), Other Health Impairment ("OHI"), and Speech or Language Impairment ("SLI").  (Id.; Administrative Record ("AR") at 653.)

2. **The District's Attempts to Schedule D.P.'s 2021 IEP Team Meeting**

In April 2021, the District first attempted to schedule D.P.'s IEP team meeting.  (A.R. at 558.)  A meeting notice was sent to Parent and their counsel on April 16, 2021, a copy of that notice sent again to Parent on April 20, 2021, and yet another copy sent to Parent and their representative via email and United States mail on April 23, 2022.  (Id. at 559–560.)  The District, having not received a response, began sending prior written notices ("PWNs") with proposed meeting dates.  (Id. 505.)  The District sent five PWNs before the school year ended on May 18, 2021.  (See id. at 505, 540, 556, 558, 607.)

The following school year, the District renewed its attempts to schedule D.P.'s IEP team meeting.  It sent notices to Parent and Parent's representative three times through July and August 2021 before Parent's representative responded; the representative notified District representatives that he planned to audio-record the IEP team meeting scheduled for August 16, 2021, before canceling the meeting the day it was set to take place and requesting the District reschedule.  (Id. at 610, 613, 616, 620.)  The District sent another PWN on August 19, 2021, and the District's legal counsel contacted Parent's representative on August 20, 2021.  (Id. at 619, 623.)  Additional contact attempts were made on August 23, 2021, August 26, 2021, August 27, 2021, and August 30, 2021, September 7, 2021, and September 14, 2021.  (Id. at 626, 628, 632.)  D.P.'s teacher also sent home three meeting notices in D.P.'s backpack on September 15, 2021, and, receiving no response, the District sent yet another PWN on September 20, 2021 offering to hold the IEP team meeting on September 24, 2021.  (Id. at 636.)  On September 24, 2021, Parents' representative notified the District that one of the Parents had an injury which barred them from participating in the IEP meeting scheduled for that day.  (Id. at 640.)

On September 27, 2021, the District requested the Parents provide dates suitable for an IEP team meeting; Parents did not respond, so the District sent another PWN on October 1, 2021.  (Id. at 640, 643.)  On October 14, 2021, Parents' representative informed the district that Parents were available on October 21 or 22, 2021—the first time Parents or their representative

had provided any dates they were able to attend an IEP team meeting since the District began contacting them in April 2021. (Id. at 646.) The District informed Parents that they could not schedule the meeting for either date provided because the 12 team members who were required to participate could not attend; the District provided alternative dates of November 5, December 7, or December 8, 2021. (Id.) Hearing no response, the District sent another PWN on October 20, 2021 reiterating the proposal. (Id. at 646.) This PWN also stated that I Parents refused to respond to the request, the District would hold the meeting without Parents on December 8, 2021. (Id.) On November 3, 2021, the District sent a final PWN. (Id. at 650.)

### 3. The May 2021 Assessment

In May 2021, the District completed D.P.'s triennial assessment, which included assessment in the following areas: psycho-education, speech and language, occupational therapy, physical therapy, health, academics, and a functional behavior analysis. (A.R. at 483-491, 493-503, 508-511, 513-538, 542-554.)

### 4. The December 8, 2021 IEP Team Meeting

On December 8, 2021, the District convened D.P.'s IEP team meeting without Parents. (Id. at 696-700.) The IEP team reviewed D.P.'s May 2021 assessment and concluded that D.P. continued to be eligible for special education under Multiple Disabilities ("MD") and Speech or Language Impairment ("SLI"). The IEP team identified the following goals: three speech/language/communication goals to address D.P.'s needs in the areas of pragmatics/social skills, vocabulary development, and AAC development, and an occupational therapy goal to address D.P.'s fine/visual motor skills aimed at developing foundational skills needed for writing. (A.R. at 704, 684-686, 687, 1621:5-1623:13, 1676:6-1681:17.) It was also determined that these goals could be implemented for the remainder of the school year in the "moderate/severe special day class" at Falcon Ridge Elementary School. (Id. at 704, 694-695, 690-691.)

The FAPE offered by the IEP team also included the following:

- 1230 minutes per week for English Language Arts, Math, Social Studies and Science;
- speech and language services 3 times per week for 20 minutes each session (2 sessions individual and 1 small group);
- occupational therapy 25 sessions per year for 20 minutes each session push-in;
- a full-time one-on-one aide;
- 60 minutes per month of consultation by a Board-Certified Behavior Analyst; and,
- door to door transportation.

(A.R. at 704, 694-95, 690-91.) Additionally, the IEP team recommended that for the 2022-2023 school year, since D.P. would be transitioning to middle school, he should be placed in a moderate/severe special day class for core academic classes, with the services minutes adjusted

for the length of the middle school instructional day, but all other services remained the same. (Id. at 690, 704-05.)

### 5. The Due Process Hearing and OAH Decision

On January 21, 2022, the District filed a request for due process hearing with OAH, seeking a determination that the IEP offered Defendant a FAPE such that the district could implement the IEP without Parents' consent. (Id. at 1–9.) On January 24, 2022, Parents filed their own due process hearing request, alleging a number of FAPE claims against the District. (Id. at 48–79, 80–132.) The matters were consolidated and the ALJ held a due process hearing over seven days in late March and early April 2022. (Id. at 184–188, 805; see OAH Order.) The following issues were presented:

<u>D.P.'s Issues</u>

1. Did Etiwanda deny Student a FAPE by failing to conduct an appropriate psychoeducational assessment dated May 17, 2021?

2. Did Etiwanda deny Student a FAPE by failing to conduct a functional behavior analysis of Student prior to the December 8, 2021 IEP team meeting?

3. Did Etiwanda's December 8, 2021 IEP deny Student a FAPE by failing to offer Student:

- Appropriate goals in the areas of:

    i. Listening comprehension;
    ii. Vocabulary;
    iii. Sorting;
    iv. One-to-one correspondence;
    v. Personal information;
    vi. Functional equivalent replacement behavior;
    vii. General positive behavior;
    viii. Pragmatics and social skills;

- A behavior intervention plan;

- Appropriate services to address Student's auditory processing sensory deficits;

- A one-to-one aide for the entire school day, and during Student's round trip bus transportation to school;

- Placement in a general education classroom for 50 percent of Student's school day;

- Home applied behavior analysis therapy and clinic meetings;

- Parent training for addressing Student's behavioral issues;

- Equestrian therapy;

- Appropriate speech and language services;

- Appropriate occupational therapy;

- An independent educational evaluation of Student's need for physical therapy and agreement to fund physical therapy by a non-public agency based on the independent evaluator's recommendation;

- Behavior counseling; and,

- Tutoring by a non-public agency?

4. Did Etiwanda prevent Parent from meaningfully participating in the development of Student's IEP by holding Student's December 8, 2021 IEP team meeting without Parent?

The District's Issue

5. Did Etiwanda's December 8, 2021 IEP offer Student a FAPE such that Etiwanda can implement the December 8, 2021 IEP without Parents' consent?

(A.R. at 806–808.)

On May 27, 2022, the ALJ issued a decision in favor of the District on D.P.'s issues 3(a) – (h), (l), and (m), and in favor of D.P. on Issue 3(i), (j), and (k), 4, and 5. (See OAH Decision.)

C.  **Conclusions of Law**

The District argues that the December 8, 2023 IEP offered D.P. a FAPE, and the ALJ erred in concluding otherwise.  Each of the ALJ's five decisions against the District concerns an aspect of the IEP that the ALJ concluded was inadequate.  The Court discusses each in turn.

1. **Issue No. 5: Whether the IEP Offered D.P. a FAPE Such That The District May Implement the IEP Without Parents' Consent**

The ALJ concluded that the IEP did not offer D.P. a FAPE, and thus the IEP could not be implemented without Parents' consent. For the reasons below, the Court agrees. The Court first sets out additional issue-specific facts found by the ALJ before explaining the ALJ's legal analysis and the Court's reasons for affirming the decision.

### a. The ALJ's Reasoning and Conclusion

The ALJ concluded that the December 8, 2021 IEP did not offer D.P. a FAPE such that the District would be permitted to implement the IEP without Parents' consent, and came to this conclusion without reaching the question of whether Parents' non-attendance at the IEP team meeting was a fatal, substantive flaw that itself deprived D.P. of a FAPE. (OAH Decision at 5.) Instead, the ALJ found that the IEP did not offer D.P. a FAPE "because the IEP team failed to offer a goal to address [D.P.'s] intelligibility and sound production need" and "also failed to offer a measurable vocabulary development goal, or any occupational therapy goal in praxis/motor planning or social participation." (Id. at 6.) These omitted goals rendered the IEP insufficient because D.P.'s disability-related needs were not met, and the ALJ thus concluded that it was unnecessary to inquire into the procedural compliance of the IEP (i.e., whether it was permissible to proceed with the IEP team meeting without Parents present). (Id.)

The ALJ made the following factual findings relevant to this conclusion. First, the District offered an intelligibility/sound production goal in D.P.'s July 2020 IEP which specified that he would produce certain consonant-vowel combinations. (Id. at 8.) Student had not met this intelligibility goal by the time of his May 2021 assessment and could only correctly pronounce targeted sounds in 30% of words. (Id. at 8–9.) Cathy Wilkerson, the speech and language pathologist for the District, provided speech and language services to D.P. and conducted the speech and language portion of his assessment in April 2021. (Id. at 9.) Wilkerson testified at the hearing, and the ALJ concluded that her testimony was "clear, detailed, and exhibited a thorough knowledge of [D.P.] in the speech and language context, and was credible." (Id.) In her May 11, 2021 report, Wilkerson concluded that D.P. "continued to meet eligibility criteria for a speech/language disorder in the area of, among other things, articulation; [D.P.'s] language skills were at a three-year-old level; and that [D.P.'s] speech/language disorder was severe." (Id.) Wilkerson also opined that D.P. had difficulty making non-sound producing motions with his mouth, and although he could make two or three-word utterances, most of those words were approximations. (Id.) She also testified that she was trained to facilitate articulation by using tactile cues such as placing her hands on a student's mouth, but D.P. did not like to be touched. (Id. at 10.) Wilkerson ultimately concluded that most of D.P.s phoneme and/or phonological process errors were not stimulable for correct production, but did not opine that this conclusion meant further intelligibility/sound production work was futile. (Id. at 9.) Indeed, the December 8, 2021 IEP team found that intelligibility and sound production were areas of need, and that goals would be written to address this area. (Id. at 8–9.)

The December 8, 2021 IEP did not, however, offer a goal in intelligibility and sound production, and included a progress report on the July 2020 intelligibility goal which stated that D.P. had not progressed on that goal due to his lack of participation in distance learning during

the COVID pandemic. (Id. at 10.) According to the ALJ, "no witness at [the] hearing testified that the December 8, 2021 IEP team concluded [D.P.] could not longer benefit from work on an intelligibility goal, or gave explanation as to why an intelligibility goal was not included." (Id.) As such, the District "failed to offer a necessary goal to address [D.P.'s need in intelligibility and sound production, rendering the IEP insufficient to constitute a FAPE or to implement without parental consent." (Id.)

The ALJ also found facts and provided reasoning specific to her conclusion concerning the immeasurability of D.P.'s vocabulary development goal. The relevant vocabulary development goal states that D.P. would identify, sort and label at least 24 items/pictures into categories "with verbal approximation sign, speech generating device" with 70% accuracy over four consecutive sessions with no more than two additional verbal or visual cues. (Id. at 11.) However, the goal did not specify whether it would be met if D.P. used any of the methods to sort a total of 24 items/pictures, or if instead he was expected to sort 24 items using each method—that is, verbal approximation, sign, and speech generating device. (Id.) Because the goal was not specific as to be how it would be measured, it was not legally compliant, and rendered the IEP defective, barring the Distract from implementing the IEP without parental consent. (Id.)

Finally, the ALJ concluded that because the IEP failed to address D.P.'s needs in praxis/motor planning and social participation, the IEP was defective and did not provide a FAPE. (Id. at 11–14.) This ALJ reached this conclusion after weighing competing testimony offered by the District's occupational therapist, Will Hardy, and the witness offered by Parents, JanDee Goodiss, an occupational therapist who was not affiliated with the District but who, during her career, provided pediatric occupational therapy to children, including at another California school district. (Id.)

Hardy provided occupational therapy services to D.P. from March 2020 until February 2022 and conducted D.P.'s April 2021 occupational therapy assessment. (Id. at 12.) He concluded in his report that D.P. had school-based occupational therapy needs in fine motor and pre-writing skills, and the IEP team offered D.P. a goal in this area. (Id.) But Hardy also found that D.P. exhibited "definite dysfunction" in praxis/motor planning and social participation, but did not identify these as areas of need for D.P., because his dysfunctions in praxis/motor planning and social participation were not due to any sensory processing impairment. (Id. at 12–13.) The IEP team thus did not offer D.P. goals in those areas. (Id.) The ALJ found Hardy's testimony credible based on his education qualifications, and experience, and noted that D.P. did not challenge the appropriateness of Hardy's assessment of D.P. (Id. at 12.)

Goodiss did not assess or provide occupational therapy services to D.P., but in preparation for the hearing, she observed D.P. on a 15-minute video call and reviewed records of Hardy's assessment report and the December 8, 2021 IEP. (Id. at 13.) The ALJ found that Goodiss testified thoughtfully and was credible based on her more than 40 years of experience as a pediatric occupational therapist. (Id.) Goodiss testified that the District should have included a motor planning goal for D.P. (Id.) She based this opinion on the following: (1) the Sensory Processing Measure administered by Hardy during the assessment, which determines whether

sensory systems influence praxis/motor planning and social participation; (2) the fact that Parents and D.P.'s teacher at the time of the assessment believed that D.P. had difficulty with motor planning; and, (3) Hardy observed poor motor planning in his clinical observation of D.P. (Id.)

Based on the testimony, the ALJ concluded that Hardy's conclusion that D.P.'s occupational therapy need was limited to fine visual and motor skills and did not include praxis/motor planning or social participation was not supported by the evidence. (Id. at 14.) Hardy's assessment demonstrated that D.P. exhibited definite dysfunction in praxis/motor planning and social participation, and as such, a proper IEP would have addressed those needs, even if those impairments were caused by poor sensory processing. (Id.) The District thus failed to offer D.P. a FAPE and could not implement the IEP without parental consent. (Id.)

### b. Analysis

The District argues the ALJ's factual conclusions were incorrect because: (1) "[t]he evidence and testimony presented at hearing supports a finding that [the District] did not require IEP goals in the areas of intelligibility and sound production in order to receive a FAPE"; (2) "the ALJ incorrectly concluded that the vocabulary goal was not measurable"; and, (3) "[t]he record clearly establishes that Defendant did not require goals in [praxis/motor planning and social participation] because they were not necessary to receive a FAPE based on Defendant's unique needs." (Motion at 11–16.) The Court disagrees with the District in all respects.

At the outset, the Court finds that the ALJ's decision is thorough and careful and therefore subject to special deference under "modified" de novo review. See J.G. v. Douglas Cnty. Sch. Dist., 552 F.3d 786, 793 (9th Cir. 2008). The ALJ's decision contains a factual background and issue-specific analysis, as well as conclusions regarding the credibility of those who testified at the hearing. Therefore, the Court summarily rejects much of the District's argumentation concerning the sufficiency of the evidence as attempts to second-guess the ALJ's thorough fact-finding.

The District argues that sound intelligibility and production goals were not necessary, and the ALJ erred by concluding otherwise because there was no affirmative evidence presented at the hearing which indicated that such goals were necessary. (Motion at 11–12.) Not so. The ALJ concluded that although Wilkerson's testimony was credible, she did not—nor did any other witness—credibly testify that the December 8, 2021 IEP team concluded D.P. could not longer benefit from an intelligibility goal. (OAH Decision at 10.) The ALJ found that because sound intelligibility and production goals were included in a previous IEP, those goals were not met, and no explanation for why the IEP team failed to include those goals in the December 8 IEP was offered, those goals were still necessary, and the District failed to offer them. (Id. at 9–10.) That conclusion is eminently reasonable. As the District points out, the Supreme Court has instructed that a FAPE must provide a "basic floor of opportunity" to disabled students, not a "potential-maximizing education." Rowley, 458 U.S. at 201 n. 23 (1982). Contrary to the District's position, however, the ALJ did not misapply the standard for determining whether an IEP goal is

necessary. (See Motion at 12.) The ALJ did not inquire into whether D.P. "could benefit" from sound intelligibility and production goals; she considered whether there was sufficient evidence justifying the removal of those goals from a prior IEP, and concluded that there was none. The Court agrees, and concludes that the December 8, 2021 IEP failed to include necessary sound intelligibility and production goals, and thus the District failed to offer D.P. a FAPE.

The Court also rejects the District's argument the ALJ incorrectly concluded that the vocabulary goal was not measurable. The ALJ's decision properly states the law concerning the measurability of IEP goals:

> The IEP must include a statement of measurable annual goals, including academic and functional goals, designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum, and meet each of the child's other educational needs that result from the child's disability. 20 U.S.C. § 1414(d)(1)(A)(i)(II); 34 C.F.R. § 300.320(a)(2); Ed. Code, § 56345, subd. (a)(2). In addition, the IEP must contain statements of how the child's goals will be measured and the special education and related services, based on peer-reviewed research to the extent practicable, that will be provided to the student. 20 U.S.C. §1414(d)(1)(A)(i)(III), (IV); 34 C.F.R. § 300.320(a)(3), (4); Ed. Code, § 56345, subd. (a)(3), (4).

(OAH Decision at 10–11.) The District contends, however, that "goals don't necessarily need to detail every step of the measurement process in order to be measurable, and the regulations do not list rigid requirements for what to include an annual goal." (Motion at 14.) In support of this contention, the District cites an Oregon Department of Education Administrative Officer decision, which the Court references by judicial notice as detailed above. (Id.) This decision is not binding nor persuasive, and the District fails to offer any pincite which might indicate to the Court why the District believes the decision sheds light on the question presented here. Of course, the District is correct that goals need not detail "every step of the measurement process," but that is not what the ALJ concluded.

The ALJ found that the goal which stated that D.P. would identify, sort and label at least 24 items/pictures into categories "with verbal approximation, sign, speech generating device" was unclear because the goal might require that D.P. be able to use those three methods in conjunction to identify 24 items or, instead, require D.P. to be able to use each method separately to identify 24 items. (Id. at 10–12.) The Court agrees that the goal is vague and could be interpreted in two different ways, and thus affirms the ALJ's decision that the goal was not specific as to how it would be measured, which rendered the IEP defective such that the IEP did not constitute a FAPE.

Finally, the Court affirms the ALJ's decision that the IEP failed to include necessary goals in praxis/motor planning and social participation. The District urges that the ALJ improperly weighed the testimony of its expert, Hardy, and Parents' expert, Goodiss. (Motion at 15–16.) The Court defers to the ALJ's decision regarding the relative weight to give each expert. The

District is correct that "an IEP must take into account what was, and what was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." (Motion at 16 (quoting J.G., 552 F.3d at 801).) Goodiss did not assess D.P. at the time the IEP was drafted, and only spent a short period of time observing D.P. via Zoom in the days before the OAH hearing. (OAH Decision at 13.) But the ALJ did not rely on Goodiss's observation of D.P. The ALJ relied instead on Goodiss's testimony concerning *Hardy's* Sensory Processing Measure and observations. (See id.) Hardy observed poor motor planning in his clinical observation and found that social participation was an area of definite dysfunction for D.P., and the ALJ disagreed with Hardy's conclusion that no praxis/motor planning goals were needed because Hardy himself had identified these as areas of dysfunction. (Id. at 14.) The Court affirms the ALJ's conclusion.

In sum, the Court **AFFIRMS** the ALJ's conclusion that the IEP did not offer D.P. a FAPE, and thus the IEP could not be implemented without Parents' consent.

### 2. Issue Nos. 3(i) and (j): Whether the IEP Denied D.P. a FAPE by Failing to Offer Appropriate Speech and Language and Occupational Therapy Services

D.P. separately raised an additional issue concerning the IEP offered by the District: whether the District failed to offer him a FAPE because the IEP did not offer adequate occupational therapy and speech and language services. (Id. at 27.) The ALJ concluded that the IEP did not offer D.P. adequate occupational therapy and speech and language services because the services offered did not address the additional areas of need for which the IEP failed to offer appropriate goals—that is, intelligibility and sound production, vocabulary development, praxis/motor planning, and social participation. Because the occupational therapy services offered did not address the "missing" but necessary goals, the services, too, were insufficient, and the IEP also suffered from this flaw. (Id. at 29.)

The District misunderstands the ALJ's ruling on this issue. The District argues that the ALJ improperly weighed Goodiss's testimony more heavily than Hardy's, but Hardy credibly testified that the occupational therapy services offered in the IEP were appropriate to allow D.P. to progress toward his fine/visual motor goal, and no other goals were necessary. (Motion at 17.) But the ALJ's conclusion was based on her previous finding that the IEP failed to provide necessary goals, and as a result, the District similarly fell short with regard to the occupational therapy services it offered in the IEP:

> [The District] established that the frequency and duration of occupational therapy services were adequate to address [D.P.'s] fine motor and visual motor tracing goal. The occupational therapy service offered was not, however, adequate to address [D.P.'s] praxis/motor planning or social participation needs, because [the District] did not offer goals in those areas, as discussed in Issue 5. [D.P.] proved that the December 8, 2021, IEP failed to offer [D.P.] a FAPE by failing to offer appropriate related services to meet [D.P.'s] intelligibility and sound production, vocabulary development, praxis/motor planning, and social participation needs.

The Court agrees with the ALJ that the occupational therapy services offered by the IEP were inadequate because they did not address the additional goals the IEP failed to include. The Court therefore affirms the ALJ's decision on this issue.

### 3. Issue No. 3(k): Whether the District Owed D.P. an Independent Physical Therapy Evaluation and Physical Therapy by a Non-Public Agency

The final decision at issue here is the ALJ's conclusion that the District failed to provide a FAPE by refusing to fund an independent physical therapy educational evaluation for D.P. (Motion at 18; OAH Decision at 32.) The ALJ also found that the District failed to offer a physical therapy independent educational evaluation and funded physical therapy by a non-public agency based on the results of the independent evaluation. (OAH Decision at 29–30.) The District contends that the ALJ improperly changed the issue plead by D.P., and thus the ALJ's conclusion cannot stand. (Motion at 18–21.)

In his OAH pleading, D.P. described this issue as follows: "Did [the District's] December 8, 2021 IEP deny [D.P.] a FAPE by failing to offer [D.P.] . . . [a]n independent educational evaluation of [D.P.'s] need for physical therapy and agreement to fund physical therapy by a non-public agency based on the independent evaluator's recommendation." (Id. at 18.) Accordingly, the ALJ analyzed if the District's December 8, 2021 IEP "denied [D.P.] a FAPE by failing to offer [D.P.] a physical therapy independent educational evaluation." (OAH Decision at 29.)

In reaching her conclusion, the ALJ relied on the following facts. In April 2021, physical therapist Sloane Allen conducted a physical therapy assessment of D.P. (Id. at 29, 30.) Physical therapist Barbara Heidelman presented Allen's report to the IEP team on December 8, 2021. (Id. at 30.) On January 3, 2022, Parents requested, via email from Parents' representative, that the District fund an evaluation by a non-public physical therapist of Parents' choice, and that the District fund non-public physical therapy services based on that evaluation. (Id. at 30–31.) On January 18, 2022, the District sent Parents a PWN denying the request, which stated: "if you disagree with the results of the District's physical therapy assessment and are requesting an independent educational evaluation, then please let me know so the District can respond accordingly." (Id. at 31.) Ultimately, the District did not fund the requested physical therapy assessment. (Id.)

The ALJ reasoned that "the January 3, 2022 request for an independent physical therapy evaluation was, by its nature, a disagreement with [the District's] physical therapy assessment" and thus "triggered [the District's] obligation to either fund an independent evaluation or to file for a due process determination that the district assessment was legally compliant." (OAH Decision at 31.) Failing to fund the evaluation or file for a due process determination concerning the District's assessment was a procedural violation of the IDEA because the information Parents sought via that assessment infringed Parents' ability to advocate for services and deprived Parents of the ability to meaningfully participate in a discussion of D.P.'s physical therapy needs in connection with the provision of a FAPE. (Id. at 32.) The ALJ thus concluded that the

District denied D.P. a FAPE by failing to fund an independent physical therapy educational evaluation. (Id.)

The District argues that because IEPs "do not offer independent educational evaluations," and are instead "meant to offer an educational program that the District believes to be a FAPE based on the student's unique needs after assessments . . . the issue the ALJ should have decided was whether the December 8, 2021 IEP denied [D.P.] a FAPE based on a failure to provide physical therapy services." (Motion at 18.) The Court disagrees. Contrary to the District's assertion, the ALJ posed the correct question—that is, the question presented by D.P.: whether the District's failure to provide an independent educational evaluation for physical therapy denied D.P. a FAPE. (See A.R. at 546–546, 736.) And if the District did not agree with the issue as framed, it could have objected to that framing prior to and/or during the hearing. The Order Following Prehearing Conference, which was issued March 16, 2022 by Administrative Law Judge Robert G. Martin, plainly stated the issues which would be heard at the OAH Hearing. (See A.R. at 736–737.) Among those issues was: "Did [the District's] December 8, 2021 individualized education program deny [D.P.] a FAPE by failing to offer [D.P.] [a]n independent educational evaluation of [D.P.'s] need for physical therapy and agreement to fund physical therapy by a non-public agency based on the independent evaluator's recommendation?" (Id.) The District cannot now object to the framing of that question merely because it is dissatisfied with the ALJ's conclusion.

In any event (and as the District concedes), an ALJ may reorganize and restate the issues set for hearing. See Ford ex rel. Ford v. Long Beach Unified Sch. Dist., 291 F.3d 1086, 1090 (9th Cir. 2002). The Court is not persuaded by the District's unsupported belief that the ALJ should have analyzed whether the physical therapy services offered under the December 8, 2021 IEP were sufficient instead of whether the District's refusal to offer an independent educational evaluation of D.P.'s physical therapy needs denied D.P. a FAPE. The District's attempt to reframe the issue obfuscates the ALJ's factual findings which support her ultimate conclusion.

The ALJ found that the District's denial of Parents' request for an independent physical therapy evaluation constituted a procedural IDEA violation which interfered with parental participation in the development of the IEP, and thus the District failed to provide a FAPE. That conclusion is reasonable. The procedural safeguards of the IDEA provide that under certain conditions, parents are entitled to obtain an independent evaluation of a child at public expense. See 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502(a) & (b); Ed. Code §§ 56329(b), 56506(c). If IDEA procedural violations significantly impede parents' opportunity to participate in the decision-making process concerning the provision of a FAPE or otherwise causes a deprivation of educational benefits, then such violations may be held to have denied a FAPE. See Ed. Code § 56505 (f)(2); see also W.G., et al. v. Bd of Trustees of Target Range Sch. Dist., 960 F.2d 1479, 1484 (9th Cir. 1992) (superseded in part by statute on other grounds). The ALJ concluded that Parents' request for an IEE triggered an obligation on the part of the District to provide that assessment or file for due process to defend it. (OAH Decision at 32.) Because the District did neither of those things, Parents were not provided information critical to their ability to advocate for D.P.'s physical therapy services, which impeded the decisionmaking process necessary to

provide D.P. a FAPE. (Id.) The District has not presented any evidence nor case law which contradicts that conclusion.

The Court thus agrees with the ALJ's conclusion that the District's denial of Parents' request for a physical therapy IEE denied D.P. a FAPE. Accordingly, the Court **AFFIRMS** the OAH Decision concerning this issue.

### 4. Issue No. 4: Whether the District Prevented Parents from Meaningfully Participating in the Development of D.P.'s IEP by Conducting the IEP Team Meeting Without Parents

The final issue before this Court is whether the ALJ properly concluded that the District prevented Parent from meaningfully participating in the development of D.P.'s IEP by holding the December 8, 2021 IEP team meeting without Parent present. The ALJ's decision came down to one key fact: that despite the District's many attempts to contact Parent and set an amenable time and date for the IEP team meeting and Parent's consistent lack of response, "at no time did Parent affirmatively refuse to attend an IEP team meeting." (OAH Decision at 35.) According to the ALJ, although Parent "was largely uncooperative, largely unresponsive, and difficult to work with," Parent nonetheless suggested two potential meeting dates in October 2021. (Id.) although the District could not convene the required attendees on those dates, that communication from parent "indicated Parent's willingness and desire to participate." (Id.) Moreover, when Parent was emailed the Zoom link for the December 8 2021 team meeting, she responded that she would check in with her advocate. (Id.) But the District did not follow up with Parent during that meeting to determine why Parent was not in attendance. (Id.)

The question is thus whether the correspondence between the District and Parent justified, as a matter of law, the District convening the December 8, 2021 IEP team meeting without Parent present. The District contends that due to Parent's unresponsiveness it was confronted with violating one requirement of the IDEA (parental involvement in the IEP team meeting) with another (providing D.P. with an updated IEP), and thus "acted reasonably in holding the December 8, 2021, IEP meeting in Parent's absence because a failure to hold the IEP meeting and make an updated offer of placement and services would likely result in a substantive denial of FAPE to [D.P.]" (Motion at 21–25.) In support of that argument, the District relies on a separate OAH ruling in OAH Case No. 2020120161, which the Court references by judicial notice above (the "Chaffey Decision"). According to the District, that decision stands for the proposition that where a school district goes to "great lengths to convince Parents . . . to attend an IEP team meeting," the district should hold the IEP meeting "'[without Parent] under Education Code section 56341.5(h), develop[] a proposed IEP offer, and then timely file for due process to seek permission to implement its proposed IEP without Parent's consent.'" (Motion at 24 (quoting Chaffey Decision).) As the District points out, that case involves the same parents and representative as does this matter.

The Chaffey Decision, however, differs from the matter at bar in crucial respects. There, parent and parent's advocate were unresponsive to attempts to schedule the IEP team meeting

and cancelled certain scheduled meetings, and although the ALJ acknowledged that correspondence, the ALJ nonetheless admonished the school district for not initiating the IEP process sooner. (Chaffey Decision at 22.) The ALJ also found that the school district failed to inform Parent that it would not implement a previous IEP and that the district made substantial changes to the student's educational placement and instruction which did not correspond with the previous IEP and were not identified in a new IEP. (Id. at 23–24.) In sum, the district in that case failed to properly engage with parent concerning the IEP. The ALJ thus concluded:

> Although Chaffey made multiple unsuccessful attempts to schedule Student's annual IEP meeting, it should have initiated the IEP process sooner. If Parent did not respond to Chaffey's IEP team meeting notices, Chaffey should have held the IEP meeting under Education Code section 56341.5(h), developed a proposed IEP offer, and then timely filed for due process to seek permission to implement its proposed IEP without Parent's consent.

(Id. at 22.)

In the instant matter, the ALJ relied on Doug C. v. Hawaii Dept of Educ., 720 F.3d 1038 (9th Cir. 2013) ("Doug C.") in concluding that because Parent "did not affirmatively refuse to attend an IEP team meeting," and the District nonetheless conducted the IEP team meeting without Parent present, Parent was prevented from meaningfully participating in the development of D.P.'s IEP team meeting. (OAH Decision at 32–36.) Doug C. involved a parent who, due to his illness, canceled an IEP meeting on the same day the meeting was scheduled and was unable to commit to attending a meeting in the days that followed due to his illness. 720 F.3d at 1042. The parent had previously canceled two scheduled IEP team meetings, and the IEP deadline was days away from the last meeting parent canceled. Id. at 1041. The school's special education coordinator decided to continue with the meeting as scheduled because he had asked "13 people on three separate occasions to change their schedules and cancel other commitments," and parent would not commit to one of the other pre-deadline dates proposed. Id. at 1042.

The Ninth Circuit found that because the IEP team meeting proceeded "without parental participation even though [parent] did not 'affirmatively refuse[ ] to attend,' but rather actively sought to reschedule the meeting in order to participate," parent was therefore denied the opportunity to participate in the IEP process, and the student was denied a FAPE. Id. at 1040-41 (citing and quoting Shapiro v. Paradise Valley Unified Sch. Dist., 317 F.3d 1072, 1078 (9th Cir. 2003) (superseded on other grounds by 20 U.S.C. § 1414(d)(1)(B)). Doug C. teaches that "the fact that it may have been frustrating to schedule meetings with or difficult to work with [parent] does not excuse" failing to include the parent in an IEP team meeting "when he expressed a willingness to participate." Id. at 1045. Schools and school districts must prioritize parent involvement in IEP team meetings because "the IDEA's protections are designed to benefit the student, not the parent," and "[a]n IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved." Id.

Indeed, given the IDEA's purpose, the attendance of parents "must take priority over other [team] members' attendance." Id.

Applying Doug C., the Court agrees with the ALJ and likewise concludes that the exclusion of Parent from the December 8, 2021 IEP team meeting amounted to a denial of FAPE. The District proposed multiple dates to Parent via written correspondence and Parent failed to respond to most of those entreaties. But as the ALJ explained, the District did not change its process of unilaterally proposing dates. Parent made three attempts to reschedule the IEP team meeting, and for two of the dates Parent suggested, the District could not gather the required attendees. In addition, Parent responded to an email with the Zoom link for the December 8, 2021 IEP meeting and informed the District that she would check in with her advocate regarding the meeting. When Parent did not attend the meeting, the District did not follow up with Parent. These facts are more like those presented in Doug C. than in the Chaffey Decision.

To be sure, the Court understands the frustrations caused by Parent and Parent's advocate, who were, as the ALJ described, "largely uncooperative, largely unresponsive, and difficult to work with." (OAH Decision at 35.) In certain circumstances, it would be reasonable for the District to have moved forward with the IEP team meeting without Parent. But here, where Parent had expressed interest in participating and offered dates for a potential meeting, the District must do more than present an ultimatum and proceed. Had the District engaged in a similarly persistent but less unilateral method of proposing potential meeting dates or waited to hear from Parent regarding the December 8, 2021 date after receiving Parent's response to the Zoom invitation, the Court may have reached a different result.

In light of the relevant case law and the ALJ's factual findings, the Court agrees with the ALJ that the District prevented Parent from meaningfully participating in the development of the IEP by holding the IEP team meeting without Parent. The Court therefore **AFFIRMS** the ALJ's decision with respect to this issue.

## IV.   CONCLUSION

Based on its findings of fact and conclusions of law, the Court concludes that the District has not demonstrated that the ALJ's factual findings were clearly erroneous, nor has the District shown that any of the issues in the OAH Decision were improper as a matter of law.

Accordingly, the Court **AFFIRMS** the OAH Decision.

**IT IS SO ORDERED.**